**Kurt GUTFREUND, et al., Plaintiffs,**

**v.**

**Robert W. CHRISTOPH, et al., Defendants.**

**No. 86 C 6821.**

United States District Court, N.D. Illinois, E.D.

April 20, 1987.

Supplemental Memorandum Order July 6, 1987.

---

Herbert Beigel, Paul R. Shuldiner, Dean Armstrong of Beigel & Lichtenstein, Chicago, Ill., for plaintiffs.

Clifford Yuknis, Joel Sprayregen, David W. Gleicher, Chicago, Ill., for Christoph.

Michael Bruton, Pretzel & Stouffer, Chtd., Chicago, Ill., for Ostrow.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Kurt Gutfreund[1] and 16 other investors initially filed a nine-count Amended Complaint (the "Complaint") against Robert W. Christoph ("Christoph"), Gordon D. Boydston ("Boydston"), Ostrow Reisin Berk & Abrams, Ltd. ("Ostrow") (an accounting firm) and Michigan limited partnership Fox Briar Farm, alleging:

1. federal statutory violations involving:

(a) Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b) ("Section 10(b)") and related SEC Rule 10b–5;

(b) Securities Act of 1933 ("1933 Act") §§ 12(2) and 17(a), 15 U.S.C. §§ 77*l*(2) and 77q(a) ("Section 12(2)" and "Section 17(a)"); and

(c) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), (c) and (d) ("Sections 1962(a), (c) and (d)"); and

2. state statutory and common law violations involving:

(a) fraud;

(b) breach of fiduciary duties; and

(c) the Illinois Securities Law, Ill. Rev.Stat. ch. 121½, ¶ 137.13 ("Section 137.13").

Now Christoph moves for dismissal of four of the claims asserted against him, and Ostrow for dismissal of all seven claims asserted against it, under Fed.R.Civ.P. ("Rule") 12(b)(6). For the reasons stated in this memorandum opinion and order, each motion is granted in part and denied in part.

### Facts[2]

Between April and August 1983 (Ex. A) plaintiffs executed subscription agreements (the "Agreements") in which they agreed to invest as limited partners in Fox Briar Farm Limited Partnership ("Fox Briar"). As the transaction was structured, Fox Briar was to acquire for $1.45 million a Michigan dairy farm (the "farm") owned by Christoph (¶¶ 12, 15). Part of the purchase price ($175,000) was to be paid in cash as a down payment and the balance ($1.275 million) was to be paid to Christoph in deferred payments. Part of the deferred payment ($950,000) was secured by the farm's real estate and personal property (¶ 15).[3]

It was contemplated that the farm would generate enough cash flow to service Fox Briar's debt obligations and generate a profit for Fox Briar and its limited partners (¶ 15). However, each limited partner was required to execute an "Assumption Agreement" under which, in case of any default under the contract for purchase of the farm, he or she would be liable for his or her share of the balance due on the farm (¶ 15).

To carry out the alleged scheme to defraud plaintiffs, Christoph enlisted Boydston to be one of the Fox Briar general partners (¶ 13). Christoph and Boydston

---

**1.** Gutfreund is no longer a plaintiff. On December 29, 1986 he entered into a stipulation with defendants, dismissing his complaint with prejudice.

**2.** Rule 12(b)(6) principles require this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in plaintiffs' favor. *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985). All citations to the Complaint will simply take the form "¶ —" or "Ex.—." Plaintiffs' memoranda will be referred to either as "P/C Mem." (in response to

Christoph's motion) or "P/O mem." (in response to Ostrow's motion). For simplicity, all Complaint counts will be identified by Arabic numerals rather than spelled out ("1" rather than "One"), though plaintiffs actually use the latter form.

**3.** P/O Mem. 2 explains that after Fox Briar had acquired the farm from Christoph, it in effect resold the farm to the investors in the form of limited partnership interests.

then retained Ostrow to prepare certain financial projections designed to persuade plaintiffs of Fox Briar's economic viability (¶ 14). Those projections were placed in a Private Placement Memorandum (the "Memorandum") prepared, issued and distributed by defendants (¶ 5).

Plaintiffs charge fraudulent representations infected the Memorandum. To avoid any potential mischaracterization, the Complaint will be quoted verbatim:

17. In order to induce plaintiffs to invest in Fox Briar Farm, defendants Christoph and Boydston in the [Memorandum] and otherwise, falsely represented, among other things, that:

(a) the size of the herd would increase, thereby providing increased production of milk; and

(b) the projected revenues reflect increases in prices and production of milk.

18. These representations were materially false and misleading in that:

(a) the physical plant of the farm could not accommodate the projected increase in the herd; and

(b) the projections were based upon false assumptions, such as increasing milk prices and increases in the size and quality of the herd.

19. The [Memorandum] was false and misleading in that it failed to disclose, among other things, the following material facts:

(a) The herd was not high of quality [sic];

(b) The historical trend of milk prices in Michigan for equivalent farms for the period 1981 to the sale of the limited Partnership units reflected a decline rather than the purported trend of rising prices as described in the [Memorandum] on the basis of nationwide averages through 1980;

(c) A certain number of the cattle were leased, thereby imposing an additional financial burden on the farm and the Partnership;

(d) The projected growth in the size of the herd was not possible due to financial constraints and the lack of the necessary physical facilities;

(e) Jerry L. Himebaugh, the co-general partner, and manager of the farm did not agree with the projected revenues and considered them to be inflated; and

(f) Certain equipment was subject to security interests and liens, and also was pledged as security for the purchase of the farm.

\* \* \* \* \* \*

21. Defendant Ostrow knowingly aided and abetted the fraudulent scheme set forth above by consciously engaging in conduct for the purpose of facilitating the fraud. Said conduct included but was not limited to the following:

Knowingly or recklessly, providing projections which contained insupportable assumptions, omitted to disclose the true facts of the relevant historical milk prices, the operating history of the farm, and the matters set forth in paragraph 19 above.

22. Defendant Ostrow was aware of the misrepresentations and omissions by the other defendants set forth above in that at a minimum it knew the contents of the [Memorandum] and the lack of reasonable possibility of economic gain. These projections were of critical importance to Christoph and Boydston's efforts to sell the limited Partnership units.

\* \* \* \* \* \*

26. Defendant Ostrow misrepresented the true facts regarding its Financial Projections. This was done on two occasions, March 7, 1983, when the original Financial Projections were issued, and on March 27, 1984, when Financial Projections for the Expansion of Present Limited Partnership Interests ("Expansion") were issued. In Note 1 of the Expansion Financial Projections, reference was made to the original Financial Projections as providing a complete discussion of the assumptions made and possible consequences. Upon information and belief, all of the existing Fox Briar investors also received a copy of the Expansion private placement memorandum.

This reference constituted a republication of Ostrows' original erroneous findings and further misled the investors both in relation to the Expansion and the original Fox Briar farm investment. This republication lulled the plaintiffs into a false sense of security regarding the viability of their investments.

Defendants allegedly concealed their unlawful conduct from plaintiffs by subsequently promoting the acquisition by Fox Briar of another farm and by not providing plaintiffs with adequate documentation regarding their investments (¶ 24). Thus plaintiffs allege:

25. Prior to 1986, and shortly before the filing of this complaint, plaintiffs were unaware of any of the true facts as described above, and could not have reasonably discovered such facts until a default occurred in the contract of purchase in or about March, 1986, when investor contributions were used by Boydston to maintain the solvency of the farm rather than make the required payments to Christoph. Prior to this time and due to the fraudulent concealment of defendants, plaintiffs were unaware of the true facts pertaining to the economics of the farm. Plaintiffs therefore could not have discovered the untrue statements and omissions by the exercise of reasonable diligence until 1986. Any efforts by plaintiffs to discover the fraud at an earlier time would have proven and did prove unsuccessful due to the acts of fraudulent concealment described above and defendants' refusal to make information available to plaintiffs.[4]

In an attempt to intimidate the limited partners, Christoph has allegedly "consistently threatened legal action" that would have the effect of jeopardizing any remaining value of plaintiffs' investments (*id.*).[5] Christoph has also refused or failed to provide accurate information to the limited partners (*id.*). Three plaintiffs (Gutfreund, Bandiera and Johnson) filed this action Sep-

tember 11, 1986. On November 11, 1986 an Amended Complaint was filed adding the remaining 13 plaintiffs.

### *Federal Securities Claims*

**1.** *Section 10(b) and Rule 10b–5:*

Plaintiffs' Count 1 ¶ 16 alleges:

[D]efendants, and each of them, separately and in concert, directly and indirectly, conspired to, aided and abetted each other, and did through the use of the mails and other means and instrumentalities of interstate commerce, in connection with the purchase of securities, knowingly, willfully and recklessly [violate Section 10(b) and Rule 10b–5].

Only Ostrow moves to dismiss those claims against it on two grounds:

1. They are barred by the statute of limitations.

2. Plaintiffs' Complaint fails to identify with sufficient particularity what theories of recovery are alleged against each defendant.

Ostrow also moves to dismiss Count 1 to the extent it alleges Ostrow:

1. failed to disclose material facts— because Ostrow had no duty to disclose to plaintiffs;

2. aided and abetted a Section 10(b) violation or conspired to violate that section—because secondary liability should no longer be recognized under Section 10(b);

3. conspired to violate Section 10(b)— because the Complaint does not allege (a) an agreement existed and (b) Ostrow committed acts in furtherance of that agreement.

This opinion treats with each of those arguments in turn.

### (a) *Statute of Limitations*

■ There is neither a general federal statute of limitations nor a time limitation specified in the federal statutes giving rise to plaintiffs' Section 10(b) and Rule 10b–5

---

**4.** [Footnote by this Court] P/O Mem. 6 says Fox Briar lost money and plaintiffs have not received any cash distributions.

**5.** P/C Mem. Ex. A is a copy of a Complaint filed in the Circuit Court of Cook County by Chris-

toph against one of the plaintiffs for money allegedly due under the Assumption Agreement. P/C Mem. 3 n. 2 says Christoph has personally sued every plaintiff except one for breach of those Agreements.

claims in Count 1. Hence this Court must borrow the applicable statute from analogous state law (*Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452, 455–56 (7th Cir.1987), continuing to adhere to *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 125–28 (7th Cir.1972)). Illinois' tolling doctrines must be borrowed as well (*Andrews v. Heinold Commodities, Inc.*, 771 F.2d 184, 186 (7th Cir.1985)), unless (*id.* at n. 3, quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)):

> their application would be inconsistent with the federal policy underlying the cause of action under consideration.[6]

Thus this Court looks to Illinois law to determine whether plaintiffs' claims against Ostrow are barred by limitations. When plaintiffs invested in Fox Briar in 1983, Ill.Rev.Stat. ch. 121½, ¶ 137.13 D ("Section 137.13 D") (the most analogous state statute of limitations, *Parrent*, 455 F.2d at 125–28) provided:

> No action shall be brought for relief under this Section or upon or because of any of the matters for which relief is granted by this Section after three years from the date of sale.

Ostrow Mem. 2 notes the last plaintiff invested in Fox Briar in August 1983, yet plaintiffs did not assert their claims until more than three years later—in September 1986. Though P/O Mem. 21–25 does not dispute that point, it urges the claims are nevertheless timely (*id.* at 25, referring to *Tomera v. Galt*, 511 F.2d 504, 509–10 (7th Cir.1975)) "because of the well-recognized doctrines of equitable tolling and fraudulent concealment...."

Apparently neither side is aware that effective January 1, 1986 (four months before the third anniversary of the date plaintiffs began investing in Fox Briar) Section 137.13 D was amended to provide ("Amended Section 137.13 D"):

> No action shall be brought for relief under this Section or upon or because of any matters for which relief is granted by this Section after 3 years from the date of sale, provided, that if the party bringing the action neither knew nor in the exercise of reasonable diligence should have known of any alleged violation of subsection E, F, G, H, I or J of Section 12 of this Act which is the basis for the action, the 3 year period provided herein shall begin to run upon the earlier of (1) the date upon which the party bringing such action has actual knowledge of the alleged violation of this Act, or (2) the date upon which the party bringing such action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable.

■ Amended Section 137.13 D specifies the limitation period for plaintiffs' claims under Illinois law, because the claims were not yet barred under Section 137.13 D when the amendment came into effect. *Arnold Engineering, Inc. v. Industrial Commission*, 72 Ill.2d 161, 165, 20 Ill.Dec. 573, 575, 380 N.E.2d 782, 784 (1978) explains:

> Where a limitation period has not expired prior to amendment, the amendatory act controls all actions and remedies not previously barred.[7]

Plaintiffs are fortunate in that change in the law,[8] for there is considerable doubt whether original Section 137.13 D would have been tolled by defendants' alleged fraudulent concealment of plaintiffs' claims.[9]

---

6. [Footnote by this Court] See Appendix.

7. [Footnote by this Court] P/O Mem. does not assert on this claim (but does later in connection with other claims) that the date plaintiffs executed the subscription agreements is not the "date of sale." Because a later "sale" date would only reinforce the finding plaintiffs' claims were not yet barred when Amended Section 137.13 D became effective January 1, 1986, this Court need not resolve the date-of-sale issue.

8. Plaintiffs really owe their survival to this Court's law clerk, Sheila Finnegan, whose perceptive research uncovered what counsel had not.

9. Neither side has cited any authority on that point, and this Court has been unable to find any. Although two federal cases have said fraudulent concealment tolls the statute of limitations in an Illinois-law securities claim, neither cites a single Illinois case supporting that

■ Under Amended Section 137.13 D this Court must bar the claim only of a plaintiff who (lacking actual knowledge) "ha[d] notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation" more than three years before that plaintiff filed this action in September (or November) 1986. On that score Complaint ¶ 25 alleges plaintiffs could not have discovered the basis for their claims by the exercise of reasonable diligence until 1986. Accepting (as it must for purposes of this motion) the truth of that factual allegation, this Court denies Ostrow's motion to dismiss plaintiffs' Count 1 claims as time-barred.[10]

### (b) *Particularity*

■ Ostrow Mem. 6 urges Count 1 should be stricken for failure to comply with Rule 9(b) by identifying precisely what theories of recovery are alleged against each defendant. But Complaint ¶ 16 (though awkwardly phrased) is clear enough when read in conjunction with the other allegations specifically implicating Ostrow: It alleges *each* defendant "conspired to, aided and abetted each other, and did" violate Section 10(b) and Rule 10b–5.

■ Moreover, what Rule 9(b) (emphasis added) actually requires is particularity as to the *"circumstances* constituting fraud," not as to the legal theories that are advanced based on that fraud. Such "circumstances" include (5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1297, at 403 (1969)):

> matters such as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.

In terms of those matters, the Complaint *is* lacking in particularity where it attempts to describe Ostrow's allegedly fraudulent acts. To clarify the Complaint, plaintiffs are directed to amend it in the following ways:

1. Complaint ¶ 21:

(a) State what each projection was, when and where it was made, and (as to each projection) what "insupportable assumptions" (¶ 21) Ostrow used and what "true facts" Ostrow either failed to disclose or "misrepresented" (¶ 26).[11]

(b) State whether and how Ostrow was identified to plaintiffs as the source of the projections.

2. Complaint ¶ 24:

Specify whether Ostrow is accused of the conduct alleged there and, if so, describe its role.

3. Complaint ¶ 25:

Describe what information, if any, Ostrow refused to make available to plaintiffs.

### (c) *Duty To Disclose*

Referring to Complaint ¶¶ 19 and 22, Ostrow Mem. 3–4 asks this Court to dismiss those portions of Count 1 charging Ostrow with failure to disclose certain information to plaintiffs. Ostrow Mem. 4 reasons because the Complaint does not allege Ostrow had a fiduciary relationship with plaintiffs, Ostrow had no duty to disclose information to them.

To that end Ostrow Mem. 4 cites *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir.1986). There plaintiffs sought to hold a law firm and accounting firm liable under Section 10(b) and Rule 10b–5 for failing to blow the whistle on a

---

proposition. See *Peoria Union,* 698 F.2d 320, 328; *Zahorik v. Smith Barnet, Harris Upham & Co.,* No. 86 C 3638, slip op. at 6 (N.D.Ill. Jan. 14, 1987) [Available on WESTLAW, DCT database]. Any such federal ipse dixit has to be regarded with some suspicion. According to the Interpretive Comments to Amended Section 137.13 D, in Ill.Ann.Stat. ch. 121½, ¶ 137.13 (Smith Hurd Supp.1986) (emphasis added):

> This tolling amendment was designed particularly to cover cases of fraudulent concealment or so-called "lulling" activities by promoters. *Heretofore, the three-year statute of limitations*

*could be an absolute bar to an action even if its discovery was not reasonable or subverted.*

**10.** Of course this is only the pleading stage of the litigation. Ostrow may ultimately succeed in proving plaintiffs, had they exercised reasonable diligence, would have discovered their causes of action before September (or November) 1983.

**11.** Some of that information may be intended to be provided in ¶ 26. If so, plaintiffs should consolidate ¶¶ 21 and 26.

foundation that had sold bonds to plaintiffs, even though the firms had not assisted in preparing the foundation's allegedly fraudulent selling documents. Finding neither firm had a duty to disclose, the Court rejected liability on that ground (*id.* at 497):

> The district court also held that the Firms had not committed any forbidden act, had not participated in a scheme to defraud by remaining silent when there was a duty to speak. This, too, is a correct conclusion. Neither lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose.[12]

■ To the extent plaintiffs seek to impose liability on Ostrow merely for not blowing the whistle on Christoph and Boydston, this Court must therefore grant Ostrow's motion to dismiss. As this opinion later explains, the Complaint does not contain allegations tending to show Ostrow had a fiduciary relationship with plaintiffs. And P/O Mem. 7–9 does not pinpoint any other basis for imposing on Ostrow a duty to disclose to plaintiffs the misrepresentations of Christoph and Boydston.

■ As this Court reads the Complaint, however, plaintiffs do not rely solely on that theory of liability. Instead they allege Ostrow's *own* projections constituted misrepresentations (in the familiar securities-law sense of misrepresentation by material omission) *because* Ostrow did not disclose certain insupportable assumptions and erroneous information (provided to it by the other defendants) upon which Ostrow based its projections.[13] To the extent Count 1 advances that theory of liability, this Court denies Ostrow's motion to dismiss.

### (d) *Secondary Liability*

Count 1 also alleges Ostrow is secondarily liable under Section 10(b) because it aided and abetted a violation of, and conspired to violate, that section. Ostrow Mem. 4 urges this Court should refuse to recognize a cause of action for secondary liability under Section 10(b) and therefore should

---

**12.** [Footnote by this Court] *Barker* also found neither firm had an intent to deceive, so they could not be liable under Section 10(b) or Rule 10b–5 (*id.*):

> There is no direct evidence that either Firm acted with intent to deceive any purchaser of the Foundation's securities. There is indeed no evidence that either Firm saw any of the Foundation's selling documents during the period 1974–78 until after the document had been placed in use. There is no serious claim that either Firm intentionally or recklessly gave bad advice to the Foundation. The Accounting Firm was fired after catching a problem in the Foundation's internal affairs.

**13.** Though the Complaint is somewhat confusing, it appears to allege:
> 1. Christoph and Boydston made several misrepresentations in Memorandum.
> 2. Ostrow knew those Memorandum representations were false, yet relied on them to make financial projections to be included in Memorandum.
> 3. Because Ostrow used that incorrect information to make its projections, those projections were false.

That reading of the Complaint is consistent with P/O Mem. 7–9's reliance on *Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir.1985), *cert. denied sub nom. Wasserstrom v. Eisenberg*, — U.S. —, 106 S.Ct. 343, 88 L.Ed.2d 290 (1985), to respond to the Ostrow Mem. arguments. In *Eisenberg* investors sued an accounting firm for providing an opinion in an offering memorandum that certain assumptions underlying the partnerships' projections were "not unreasonable." According to the investors, the accounting firm knew when it issued the opinion there was no reasonable basis for the assumptions (*id.* at 773). P/O Mem. 8–9 quotes from *Eisenberg's* discussion of how the scienter of one who has issued projections or an opinion may be established, thereby making the projections or opinion misleading under Section 10(b) and Rule 10b–5 (766 F.2d at 776, citations omitted):

> However, as this court has previously stated, an opinion must not be made "with reckless disregard for its truth or falsity," or with a lack of a "genuine belief that the information disclosed was accurate and complete in all material respects." ...

> When a representation is made by professionals or "those with greater access to information or having a special relationship to investors making use of the information," there is an obligation to disclose data indicating that the opinion or forecast may be doubtful.... When the opinion or forecast is based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may "support[ ] an inference that when [the defendant] expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion."

dismiss plaintiffs' Count 1 claims to that extent. In support of that argument Ostrow Mem. 4 asserts:

In fact, on at least four occasions since 1977 the Seventh Circuit has left this issues [sic] unresolved. *See Congregation of the Passion[, Holy Cross Province] v. Kidder Peabody [ & Co.],* 800 F.2d 177, 183 (7th Cir.1986); *SEC v. Holschuk,* 694 F.2d 130, 140 n. 15 (7th Cir. 1982); *Sundstrand Corp. v. Sun Chemical Corp.,* 553 F.2d 1033, 1044 n. 15 (7th Cir.1977).

Had Ostrow's counsel read the most recent case they cite, they would not have advanced that argument. *Congregation,* 800 F.2d at 183 (footnotes omitted) plainly said a cause of action for aiding and abetting a Section 10(b) violation *is* permissible under some circumstances:

We have frankly acknowledged that, in light of recent Supreme Court cases, there is some ambiguity about the existence of a civil cause of action for aiding and abetting a section 10(b) and Rule 10b–5 violation. This court has nevertheless held that such a cause of action may be maintained under certain circumstances. *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490 (7th Cir. 1986). We have not, however, had occasion to delineate, in any comprehensive way, the elements of such a cause of action. We need not confront that question today since, under any theory of liability, the district court's judgment must be affirmed.

■ If our Court of Appeals recognizes a cause of action for secondary liability under Section 10(b) and Rule 10b–5, this district court may not refuse to do so. It is too early to tell whether this case involves the "certain circumstances" needed for those purposes. But at this threshold pleading stage, Ostrow's motion to dismiss on that ground is denied.

### (e) *Conspiracy*

■ Ostrow Mem. 6 asserts, without bothering to cite any case law, plaintiffs'

Count 1 claims should be dismissed to the extent they attempt to state a cause of action for conspiracy to violate Section 10(b). Ostrow Mem. 6 urges the Complaint does not allege (1) an agreement existed and (2) Ostrow committed acts in furtherance of that agreement. Not so. Although the Complaint does not use those precise words, it does allege (1) Ostrow conspired with the other defendants to defraud plaintiffs and (2) made misleading projections for use in carrying out that fraud. Ostrow's motion on that score is denied as well.

2. *Section 12(2):*

In Count 2 plaintiffs:

1. allege defendants, "acting singly and in concert, aiding and abetting each other" (¶ 29), violated Sections 12(2) and 17(a);

2. tender their "units" (¶ 31) to defendants under Section 12(2).

Section 12(2) provides:

Any person who offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, so misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Both Ostrow and Christoph ask this Court to dismiss the Section 12(2) claims

against them. Ostrow Mem. 7–8 levels a dual attack on that claim:

1. Plaintiffs have not pleaded and cannot affirmatively plead compliance with the statute of limitations for Section 12(2) claims.

2. Plaintiffs have not alleged privity between Ostrow and plaintiffs or any sale of securities by Ostrow.

Christoph Mem. 1–3 urges his own dismissal for the second of those reasons (no privity and no sale). This opinion need treat only with the statute of limitations question, for it proves dispositive.

(a) *Statute of Limitations under Section 13*

1933 Act § 13, 15 U.S.C. § 77m ("Section 13") (emphasis added), provides the limitations period for Section 12(2) claims:

No action shall be maintained to enforce any liability created under section 77k or 77l (2) of this title unless brought within one year after discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or if the action is to enforce a liability created under section 77l (1) of this title, unless brought within one year after the violation upon which it is based. *In no event shall any such action be brought* to enforce a liability created under section 77k or 77l (1) of this title more than three years after the security was bona fide offered to the public, or *under section 77l(2)* of this title *more than three years after the sale.*

Compliance with that limitations period must be affirmatively alleged (*Caliber Partners, Ltd. v. Affeld*, 583 F.Supp. 1308, 1312 (N.D.Ill.1984)).

Assuming the "sale" dates are the dates plaintiffs executed the Agreements, Ostrow Mem. 7 urges plaintiffs cannot allege compliance with Section 13 because they delayed more than three years after those dates to assert the Section 12(2) claims. On that premise, because plaintiffs executed the Agreements between April and August 1983, any claims advanced after August 1986 are untimely. That would bar every plaintiff: Two of them filed their claims September 11, 1986 and the rest November 12, 1986.

P/O Mem. 25–26 responds the claims are timely because the limitations clock began running only upon defendants' last act in completing the sale (unknown at this time) —not the earlier date when plaintiffs executed the Agreements. In support of that proposition P/O Mem. 26 cites *Doran v. Petroleum Management Corp.*, 576 F.2d 91, 93 (5th Cir.1978). There the court said (without any stated analysis) that a lower court had properly commenced the running of the statute of limitations when the defendant's last activity—offer, sale or delivery—occurred ("the most lenient standard," *id.*).[14]

Section 13 is unambiguous: It speaks of "three years after the *sale.*" If *Doran* simply intended to announce defendant's "last activity" established the sale date as a matter of the law of sales, it might perhaps be right—but if it seeks instead to substitute "last activity" for the statutory term "sale," it is of course wrong. This opinion need not pause to parse *Doran* —this Court's task is to decide what constitutes the "sale" date here. That calls for examination of a representative copy of the Agreements plaintiffs executed.[15] It provides (at pages 1, 4 and 5):

I hereby agree to purchase an Interest in FOX BRIAR FARM LIMITED PARTNERSHIP (the "Partnership"), an [sic] Michigan Limited Partnership, in the capacity of an Additional Limited Partner. I hereby agree to become an Additional Limited Partner and to purchase one Partnership Interest(s) at the purchase price of $23,333.00. Said sum shall be

---

**14.** P/O Mem. 26 also cites *Folse v. Combined Equities*, 592 F.Supp. 559, 561 (W.D.La.1984), but *Folse* simply follows *Doran.*

**15.** Because the Complaint was really uninformative on this point, this Court requested and was furnished a representative copy of the Agreement (to that extent this opinion goes be-

yond the Complaint, but that bending of Rule 12(b)(6) has really facilitated decision of the current motions). Unfortunately the copy provided this Court contained the buyers' signatures but not that of Fox Briar's General Partner (and hence not the date the Agreement was accepted).

payable in accordance with the Limited Partnership Agreement. I hereby specifically accept and adopt each and every provision of the Limited Partnership Agreement attached to the [Memorandum] relating to the Partnership.

Simultaneously with the execution and delivery hereof, I am transmitting a certified or bank check, money order or bank wire to the order of "Escrow Agent, FOX BRIAR FARM LIMITED PARTNERSHIP," representing payment for my Capital Contribution in the event this Subscription Agreement is accepted and I am admitted as a Limited Partner. It is understood that the aforesaid funds will be deposited in an account with the Escrow Agents, GORDON D. BOYDSTON and JERRY L. HIMEBAUGH, and will be used as set forth in the next paragraph. It is understood that this Subscription Agreement is not binding on the Partnership unless it is accepted by a General Partner within thirty (30) days, as evidenced by the execution by them of this Agreement where indicated below. I agree that upon your request I will execute the Partnership's Certificate of Limited Partnership in the form and substance satisfactory to the General Partner.

\* \* \* \* \* \*

16. The undersigned expressly acknowledges that: ... (f) any Partnership Interests purchased pursuant hereto will be pledged to the Partnership to secure payment of the Secured Recourse Note to be executed by the undersigned, and default in payment could, among other things, result in a foreclosure of his/her Interest in the Partnership and in severe adverse economic and tax consequences to the undersigned.

\* \* \* \* \* \*

The undersigned understands and agrees that this subscription agreement may be accepted or rejected by the Partnership, in whole or in part, in its sole and absolute discretion, and if accepted, the Part-

nership Interest(s) purchased pursuant hereto will be issued only in the name of the undersigned. The undersigned hereby acknowledges and agrees that this Subscription Agreement may not be cancelled, revoked or withdrawn and that this Subscription Agreement and the documents submitted herewith shall survive (i) changes in the transactions, documents and instruments described in the Memorandum which are not material, and (ii) death or disability of the undersigned; provided, however, that if the Partnership shall not have accepted this Subscription Agreement within thirty (30) days of receipt hereof by the Partnership, by depositing in the United States mail, postage prepaid, a written notice of acceptance addressed to the undersigned at the address set forth below, this Subscription Agreement and all documents submitted herewith shall automatically be cancelled, terminated and revoked, and all funds heretofore or herewith paid shall be promptly returned to the undersigned or its successor without any allowance for interest thereon.

Agreement page 7 provides lines for the buyer's signature and the date, and (under the heading "Acceptance") for the General Partner's signature and the date. With the Agreement each buyer tendered part of the purchase price, the balance to be paid in four annual instalments required by a "Secured Recourse Note" delivered with the Agreement.

That arrangement unquestionably makes the "sale" date for each plaintiff the date Fox Briar's General Partner accepted that plaintiff's Agreement. At that point the parties were irrevocably bound to each other. What had previously been only an offer (though one that might not be "cancelled, revoked or withdrawn" for a limited time) ripened into a contract of *sale*—not an agreement to sell. Nor is that conclusion altered by the fact part of the purchase price was represented by an instalment note payable in the future.[16]

---

**16.** In that respect, nothing would hinge on the legal characterization of the note either as payment or as evidence of the plaintiff's obligation. Indeed the answer would have been no different

had the promise to pay the balance of the purchase price been purely contractual rather than embodied in a note.

■ Complaint Ex. A specifies the month and year each plaintiff executed his or her Agreement. From the representative Agreement this Court knows the General Partner was required to accept each Agreement within 30 days from that execution date (else the Agreement was "automatically ... cancelled, terminated and revoked"). To calculate the latest possible sale date for each plaintiff, then, this Court assumes:

1. Plaintiff executed his or her Agreement on the last day of the designated month.

2. Acceptance of the Agreement took place 30 days later.

But even on that best-case assumption for each plaintiff, no plaintiff filed his or her claim within three years from the date of sale. Two plaintiffs (Bandiera and Johnson) filed their claims September 11, 1986. Those claims were stale if Fox Briar had accepted their respective Agreements before September 11, 1983. According to Complaint Ex. A, Bandiera executed her Agreement in April 1983 and Johnson executed his in July 1983. Fox Briar must perforce have accepted Bandiera's Agreement by the end of May 1983 and Johnson's by the end of August 1983.

All other plaintiffs filed their claims November 12, 1986. James Smith was the last of them to execute an Agreement—in August 1983. Assuming he did so August 31, 1983, and the General Partner accepted the Agreement 30 days later (September 30, 1983), Smith was required to file his claim by September 30, 1986. Thus his claim and those of all other plaintiffs (each of whose Agreements had to have been accepted even earlier than Smith's) are barred.

■ Nonetheless P/O Mem. 25 urges the doctrine of equitable tolling should extend Section 13's three-year limitations period because plaintiffs have alleged fraudulent concealment. For that proposition P/O Mem. understandably cites no authority. Every appellate court (and the vast majority of others) that has (or have) examined Section 13 has (or have) concluded the three-year time limitation is absolute and may not be tolled based on equitable considerations. See, e.g., *Corwin v. Marney, Orton Investments*, 788 F.2d 1063, 1066 (5th Cir.1986); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Dahl v. Gardner*, 583 F.Supp. 1262, 1264 (D.Utah 1984) ("most courts have concluded that Congress meant the three-year bar to be absolute").

Given the clear language of Section 13—particularly its "in no event" provision—this Court concurs. No plaintiff has a surviving Section 12(2) claim.

3. *Section 17(a):*

Both Ostrow and Christoph urge no private cause of action exists under Section 17(a). This Court will not address that issue now for the same reason our Court of Appeals has repeatedly refused to do so (*Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 531 (7th Cir. 1985)):

We indicated in [*Peoria Union Stock Yards Co. v.*] *Penn Mutual* [*Life Insurance Co.*, 698 F.2d 320, 323–24 (7th Cir. 1983) ] that in a case in which a Rule 10b–5 action is available, there is no reason to think that a § 17(a) action would have different elements, and the claim therefore adds nothing to plaintiff's arsenal. The Fund has not argued that a private party gets the benefit of the holding in *Aaron [v. SEC*, 446 U.S. 680, 697 [100 S.Ct. 1945, 64 L.Ed.2d 611] (1980) ] that §§ 17(a)(2) and (3) do not require wilful misconduct. Here, as in *Penn Mutual*, the suit should proceed as if only a Rule 10b–5 claim had been raised.

P/O Mem. 12 concedes there is no "substantive distinction" between the Rule 10b–5 and Section 17(a) claims at this stage in the litigation. Accordingly any ruling as to the independent viability of a Section 17(a) claim is deferred unless and until a

substantive distinction develops between Rule 10b–5 and Section 17(a).[17]

### RICO Claims

Plaintiffs' Count VI alleges defendants violated RICO §§ 1962(a), (c) and (d). Each of Ostrow and Christoph has moved to dismiss those claims. Ostrow Mem. 11–13 argues:

 1. All RICO claims are time-barred.

 2. Plaintiffs have not alleged facts establishing a pattern of racketeering activity.

 3. Plaintiffs have not alleged facts establishing an enterprise.

Christoph Mem. 5–6 asserts the second of those reasons.

1. *Statute of Limitations under RICO:*

*Tellis v. United States Fidelity & Guaranty Co.,* 805 F.2d 741, 745–46 (7th Cir. 1986) held the two-year Illinois statute of limitations for actions based on a statutory penalty, Ill.Rev.Stat. ch. 110, ¶ 13–202 ("Section 13–202"), applies to all civil RICO claims. Section 13–202 provides in part:

> Actions for damages ... for a statutory penalty ... shall be commenced within 2 years next after the cause of action accrued....

To determine when plaintiffs' RICO actions "accrued" under Section 13–202,[18] this Court must again look to state law unless it is inconsistent with the federal policy underlying RICO, for *Johnson,* 421 U.S. at 464–65, 95 S.Ct. at 1722 (citations omitted) teaches:

> In virtually all statutes of limitations the chronological length of the limitation period is interrelated with provisions regarding tolling, revival, and questions of application. In borrowing a state period

of limitation for application to a federal cause of action, a federal court is relying on the State's wisdom in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim.

There is nothing anomalous or novel about this. State law has been followed in a variety of cases that raised questions concerning the overtones and details of application of the state limitation period to the federal cause of action....

Although state law is our primary guide in this area, it is not, to be sure, our exclusive guide. As the court noted in *Auto Workers v. Hoosier Corp.,* 383 U.S. [696], at 706–707 [86 S.Ct. 1107, 1113–14, 16 L.Ed.2d 192], considerations of state law may be displaced where their application would be inconsistent with the federal policy underlying the cause of action under consideration.

Indeed it would be anomalous *not* to look to state law (rather than federal law) to define a term ("accrued") contained in a state statute of limitations. If federal law were to ascribe a really different meaning to *any* substantive word in such a statute, use of the federal definition would seriously distort the concept that state law provides the rule of decision.

Notwithstanding the plain message (and logical force) of *Johnson,* however, several of this Court's colleagues have expressly held *federal* law determines when a RICO cause of action accrues under Section 13–202. *Washburn v. Brown,* No. 81 C 1475, slip op. at 3 (N.D.Ill. Jan. 23, 1987 (Kocoras, J.) [Available on WESTLAW, DCT database]; *Carlstead v. Holiday Inns, Inc.,* No. 86 C 1927, slip op. at 5 (N.D.Ill. Oct. 8, 1986) (Plunkett, J.) [Available on WEST-

---

**17.** Ostrow Mem. 8–9 also seeks dismissal of the Section 17(a) claim for reasons this opinion has already rejected in connection with the Section 10(b) and Rule 10b–5 claims:

 1. It is barred by limitations.

 2. This Court should not recognize a cause of action for secondary liability under Section 17(a).

Neither argument has any more force under Section 17(a) than it did under Section 10(b) and Rule 10b–5.

**18.** Once again the parties have either missed or ignored the difficult issues in this case—here the

accrual question. Ostrow Mem. 11 (ignoring the fact each plaintiff has a separate claim) simply assumes all plaintiffs' RICO claims "accrued" when the last Agreement was executed in August 1983, for that is the date from which that memorandum measures the passage of the two-year limitation period. P/O Mem. 26 merely responds:

> The federal "discovery rule" would apply to a plaintiff bringing a RICO action within two years of the date that he discovered, or should have discovered, the defendant's fraudulent conduct.

LAW, DCT database]; *Newman v. Wanland,* 651 F.Supp. 20, 22 (N.D.Ill.1986) (Williams, J.); *Griggs v. Robinson Securities,* No. 84 C 4679, slip op. at 7 (N.D.Ill. May 9, 1985) (Grady, J.) [Available on WESTLAW, DCT database]. Each of those cases cites *Tomera* or nothing at all for that proposition. None of those cases attempts to square its holding with the post-*Tomera* decision in *Johnson.*

Still other district courts in this Circuit (including this Court—see *HGN Corp. v. Chamberlain, Hrdlicka, White, Johnson & Williams,* 642 F.Supp. 1443, 1451–52 (N.D.Ill.1986)[19]) have not expressly held that federal law applies, but have fashioned rules for when a RICO claim accrues under Section 13–202 without any direct reference to state law. *Heritage Insurance Co. of America v. First National Bank of Cicero,* No. 84 C 8747, slip op. at 5–6 (N.D.Ill. Jan. 12, 1987) (Getzendanner, J.) [Available on WESTLAW, DCT database]; *Electronic Relays (India) Pvt. Ltd. v. Pascente,* 610 F.Supp. 648, 653 (N.D.Ill.1985) (Hart, J.). Those cases essentially draw on a common law approach (most likely reflecting the Illinois rule, but not by reason of a conscious effort to do so).

*Johnson* commands disregard of *Tomera.* This Court therefore turns to Illinois and not federal law. Because no reported Illinois case discusses when an action for a statutory penalty "accrues" under Section 13–202, it becomes necessary to look to more general rules governing the accrual of actions under Illinois law. *Aetna Life & Casualty Co. v. Sal E. Lobianco & Son Co.,* 43 Ill.App.3d 765, 767, 2 Ill.Dec. 454, 456, 357 N.E.2d 621, 623 (2d Dist.1976) (citations omitted), *aff'd sub nom. West American Insurance Co. v. Sal E. Lobianco & Son Co.,* 69 Ill.2d 126, 12 Ill.Dec. 893, 370 N.E.2d 804 (1971) instructs:

> To determine when plaintiff's cause of action "accrued," we must first determine the nature and elements of the action.
> Stated generally, a cause of action accrues so as to mark the beginning of the

limitation period "when facts exist which authorize one party to maintain an action against another." ... Otherwise stated, "(A) cause of action must have existence before it can be barred." ... Since "(t)he purpose of the statute of limitations is certainly not to shield a wrongdoer; rather it is to discourage the presentation of stale claims and to encourage diligence in the bringing of actions * * * " ..., it follows that a statute of limitations " * * * does not commence to run until the party to be barred has a right to invoke the aid of the court to enforce his remedy."

And though Illinois law does not temper the operation of every limitations statute with a discovery rule, certainly the nature of an action for a statutory penalty (which views the wrongdoer as specially culpable) interacts with the *Aetna Life* policy statement ("not to shield a wrongdoer ... [but] to encourage diligence in the bringing of actions") to suggest strongly that Illinois courts would not start the limitations clock for a RICO–type claim until plaintiff had reason to know of its existence.

In that respect it is worth noting—though it is by no means dispositive—that in an action for fraud (the basis for these plaintiffs' RICO claims) Illinois law provides the applicable statute of limitations does not accrue (*Tarpoff v. Karandjeff,* 17 Ill.2d 462, 470, 162 N.E.2d 1, 5 (1959)):

> until discovery of the fraud or such time it should have been discovered if reasonable diligence had been exercised.

Accord more recently, *Peskin v. Deutsch,* 134 Ill.App.3d 48, 55, 89 Ill.Dec. 28, 33, 479 N.E.2d 1034, 1039 (1st Dist.1985).

Accordingly this Court concludes Illinois law would superimpose such a discovery concept on the Section 13–202 two-year limitations period. That means each plaintiff's RICO claim accrued when:

1. the necessary elements for that RICO claim existed *and*

2. plaintiff discovered, or could have discovered with the exercise of reasonable diligence, the fraudulent acts forming the basis for the RICO claim.[20]

---

**19.** To the extent this Court missed this point in *HGN,* it too must plead guilty to having failed to identify and deal sua sponte with an issue not posed by the litigants.

**20.** No modification of that rule is required where a continuing conspiracy is alleged. Once a plaintiff becomes entitled to assert a RICO action to recover for an injury he or she knows

On the Complaint's allegations, each plaintiff was injured by a pattern of racketeering activity [21] when the General Partner accepted that plaintiff's Agreement and plaintiff was on the hook for the purchase price. Even though no plaintiff filed suit within two years from that acceptance date, this Court must accept plaintiffs' allegations that they could not have reasonably discovered defendants' fraudulent acts until some time after March 1986. That being so, plaintiffs' RICO claims did not "accrue" until some time in 1986. Every claim must be viewed as timely filed.

## 2. *Pattern of Racketeering*

Both Ostrow and Christoph urge the Count 6 RICO claims do not allege a pattern of racketeering activity. Ostrow Mem. 12 says:

> These allegations involve one sale of a limited partnership in which mailings were made in a single year. The acts cannot be viewed as ongoing or fairly viewed as separate transactions. All the allegations in the Complaint pertain to a single transaction.

Christoph Mem. 5 advances an identical argument, reasoning:

> Similarly, here, all the alleged acts of the Defendants related to a single transaction: The sale of Fox Briar Farm interests.

To a lexicographer—or indeed to anyone save a lawyer or a court—that contention would have a good deal of force. In normal parlance it is hard to see a single fraudulent effort, with multiple victims hoodwinked over a short time span, as establishing a "pattern." But as so frequently happens in the law, where words tend to become detached from their normal meanings through a pattern (sic) of successive interpretive decisions, a RICO "pattern" has come to bear little resemblance to the common-sense usage of the word. Under our Court of Appeals' evolution of the term, the "single transaction" notion would likely insulate defendants only if their racketeering acts were all designed "to defraud one victim ... on one occasion" (*Lipin Enterprises Inc. v. Lee*, 803 F.2d 322, 324 (7th Cir.1986)).

Here defendants allegedly defrauded *16* victims with similar racketeering activity involving separate sales over a several-month period (see this Court's opinion in *United States v. Yonan*, 622 F.Supp. 721, 728 (N.D.Ill.1985) and the identical "pattern" holding on appeal from a later decision in that case, 800 F.2d 164, 168 (7th Cir.1986); *Papagiannis*, 108 F.R.D. at 179; *Eliasen v. Hamilton*, No. 81 C 123, slip op. at 19 (N.D.Ill. Mar. 6, 1987)) [Available on WESTLAW, DCT database).[22] And Com-

---

or should know was caused by the defendants' fraudulent acts, plaintiff must do so within the two-year limitations period. But if plaintiff fails to file a timely action, recovery is barred only for that particular injury. Should defendant's continuing pattern of racketeering activity cause a later injury, plaintiff may certainly:

1. sue for damages caused by that injury, with a new limitations period applying (cf., in the analogous antitrust situation, *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971)); and

2. refer to the acts causing the first injury as evidence of a pattern of racketeering to support the RICO suit on the second injury (see, e.g., *Papagiannis v. Pontikis*, 108 F.R.D. 177, 179 (N.D.Ill.1985)).

**21.** It might be wondered whether that can fairly be said of the first purchasing limited partner. When the sale to that purchaser took place, after all, by definition no "pattern" had yet been established. But a careful reading of RICO §§ 1962 and 1964(c) discloses that the require-

ments for civil RICO recovery (using RICO § 1962(c) as an example) are only (1) defendant's conduct of the enterprise's affairs through a pattern of racketeering activity and (2) plaintiff's injury by reason of defendant's activity. It makes no difference whether the injury is caused by the onset or the conclusion of the pattern, or anything in between.

**22.** Christoph R. Mem. 6 invokes *Elliott v. Chicago Motor Club Insurance*, 809 F.2d 347 (7th Cir.1987) in support of its assertion there was one transaction (though multiple victims) here. In that case five members of the Elliott family were injured in a single automobile accident. When the family's insurance company, the Chicago Motor Club, failed to settle the Elliotts' claim under the uninsured motorist provision in their policy, the family filed a RICO action against that organization and others. In finding no pattern of racketeering activity had been shown, the Court of Appeals said (*id.* at 350):

> Likewise, any argument that there were five victims because five family members were

plaint ¶ 26 brings the asserted fraud closer to a "pattern" in the normal sense of the term by alleging defendants' lulling set of fraudulent representations in the year following the sales. Though the issue is not wholly free from doubt, this Court must deny the motion to dismiss for failure to allege a pattern of racketeering activity.

### 3. *Enterprise*

Plaintiffs define the RICO "enterprise" in these terms (¶ 52):

> As used in this count, the combination of defendants Christoph and Boydston, or Christoph, Boydston and Ostrow, or Christoph and Ostrow, or Christoph, Boydston and Himebaugh, each constitutes an "enterprise" within the meaning of 18 U.S.C. Section 1961(4), and each is engaged in interstate commerce or in activities which affect or affected interstate commerce.

Ostrow Mem. 13 says those allegations are deficient:

> Count VI merely contains allegations of a business association entered into for one transaction. The Count does not allege facts sufficient to establish that the enterprise existed apart from the pattern or that it functioned as a continuing unit.

 That cursory argument merits short shrift. First, there is no reason a "business association" may not be an "enterprise" (see Section 1961(4)), though here the Complaint in fact alleges an enterprise through association-in-fact of the defendants (cf. *Haroco Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 401 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam)).[23] Second, the alleged enterprise did not enter into "one" transaction (as just discussed) and, according to Complaint ¶ 10, it "functioned as a continuing unit" beginning in 1983 until the present. Finally, this Court finds the Complaint adequately alleges an enterprise as distinct from the pattern.[24]

### State Law Claims

### 1. *Punitive Damages*

Plaintiffs' Count 3 ¶ 34 alleges defendants acted wilfully and wantonly in defrauding plaintiffs and therefore seeks punitive damages. Although the parties agree punitive damages may be recovered only for the common law fraud claims, Ostrow R. Mem. 8 urges Count 3 is drafted so as to seek punitive damages for violation of federal securities laws as well.

Ostrow Mem. does not explain the basis for that assertion. It is of course entirely possible that the same conduct may violate multiple rules of law. Ostrow's argument is really one for consideration in drafting jury instructions for the separate claims, not at the initial pleading stage.

### 2. *Negligent Misrepresentation*

Plaintiffs' Count 4 alleges defendants:

1. "had a duty ... to represent accurately to plaintiffs complete information concerning the investments and the risks and other material facts" involving their investments (¶ 37);

2. "knew plaintiffs and other investors would rely on the representations in the [Memorandum]" (¶ 38); and

3. "failed to use reasonable care in ascertaining and representing completely and accurately the facts regarding the investments" (¶ 39).

---

injured in the case accident is not persuasive. All of the family members' claims arise from the same automobile accident and the same insurance policy. Their injuries are not distinct, as they derive from Chicago Motor Club's failure to settle their claim. By contrast, here each plaintiff was a separate purchaser in a separately negotiated transaction. Each was mailed the Memorandum and thereby induced to execute his or her own Agreement. Under the analysis developed by the case law, each plaintiff's injury must be viewed as distinct and arising out of a separate transaction—the stuff of which "patterns" may be found.

**23.** To be sure, ¶ 52 may not be sustainable as a matter of proof in separating the strands by asserting each combination of defendants as an "enterprise." At this pleading stage, however, the allegation has to survive.

**24.** Because Ostrow Mem. 13 did not trouble to point to specific allegations indicating the enterprise is not separate from the pattern, this Court finds it unnecessary to treat seriously with that issue.

Ostrow does not deny it was in the business of supplying information for the guidance of others in their business transactions (*Black, Johnson and Simmons Insurance Brokerage, Inc. v. IBM Corp.*, 109 Ill.App.3d 132, 135–36, 64 Ill.Dec. 730, 732, 440 N.E.2d 282, 284 (1st Dist.1982)). Instead Ostrow Mem. 9 urges the negligent misrepresentation claims must be dismissed because:

> This Court should not hold that the facts as alleged in the complaint establish that when an accounting firm reviews projections in a prospectus its duty to use reasonable care extends to an unlimited number of unidentified people.

Once more this opinion must resort to Illinois law—this time to examine a component of a state-law claim: whether Ostrow had a duty to plaintiffs to use reasonable care in making its projections. *Rozny v. Marnul*, 43 Ill.2d 54, 250 N.E.2d 656 (1969), the seminal Illinois case in the development of the negligent misrepresentation tort, held a land surveyor liable for a negligent survey even though the survey was not done at plaintiff's request. In finding the surveyor owed a duty to plaintiffs, the Court emphasized the reasonable foreseeability that plaintiff would rely on the surveyor's information (*id.* at 63–65, 67, 250 N.E.2d at 661–63). Both in *Rozny* and more recently in *Pelham v. Griesheimer*, 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96 (1982),[25] the Illinois Supreme Court emphasized (*Pelham*, 92 Ill.2d at 20, 64 Ill.Dec. at 547, 440 N.E.2d at 99):

> While privity of contract has been abolished in many areas of tort law, the concern is still that liability for negligence not extend to an unlimited and unknown number of potential plaintiffs.

Closer to home (in terms of the type of defendant, not geographically), *Brumley v. Touche, Ross & Co.*, 123 Ill.App.3d 636, 79 Ill.Dec. 57, 463 N.E.2d 195 (2d Dist.1984) has reexamined both *Rozny* and *Pelham* to determine the scope of the duty owed by an accountant to a third party. In *Brumley*

the plaintiff sued Touche, Ross & Co. ("Touche") for negligently performing an audit of a company plaintiff invested in after reading Touche's audit report.

First the court defined the limits of an accountant's duty of reasonable care to a third party. It rejected the theory such a duty extends to all foreseeable parties who may rely on the accountant's opinion, saying instead (123 Ill.App.3d at 642, 79 Ill. Dec. at 62, 463 N.E.2d at 200):

> In *Pelham v. Griesheimer* (1982), 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96, the court determined there could be a duty owed by an attorney to a third-party who was not his client, thus providing a broader scope of liability in a negligence action than privity. There, the test of the scope of an attorney's duty to a third-party was whether the attorney was acting at the direction of or on behalf of his client to benefit or influence a third-party. We conclude a similar rule is appropriate to the duty owed to third-parties by an accountant.

Next the Court applied that test to the plaintiff's complaint and found the complaint deficient (*id.*):

> The complaint does not allege Touche Ross knew of plaintiff or that the report was to be used by [the company] to influence plaintiff's purchase decision nor does it allege that was the primary purpose and intent of preparation of the report by Touche Ross for [the company].

In this case the fair reading of the Complaint, with the required pro-plaintiff inferences, is just the opposite: that (1) Ostrow made the projections at the direction of or on behalf of its clients Christoph and Boydston (2) to influence prospective purchasers (who turned out to be plaintiffs)—indeed, the projections were prepared primarily (if not exclusively) for that purpose. This is not at all like a garden-variety annual certification of financial statements to a company's Board of Directors, which then chooses to use those statements

---

25. In *Pelham* children brought a malpractice suit against the attorney who had represented their mother in a divorce case.

to promote a scheme of its own. On the contrary, Ostrow's development of the projections for the farm had as its preset goal the inducement of investors to buy partnership interests in Fox Briar. Plaintiffs' negligent misrepresentation claims survive.

### 3. *Breach of Fiduciary Duty*

█ Count 5 ¶ 43 alleges:

Defendants owed a fiduciary duty to plaintiffs with respect to disclosing all relevant information regarding plaintiffs' investments.

Both Ostrow and Christoph move to dismiss that Count 5 claim because it does not contain allegations establishing a fiduciary duty between them and plaintiffs.

█ Ostrow and Christoph are plainly right on that score under Illinois law. *Carey Electric Contracting, Inc. v. First National Bank of Elgin,* 74 Ill.App.3d 233, 237–38, 30 Ill.Dec. 104, 108, 392 N.E.2d 759, 763 (2d Dist.1979) (citations omitted) teaches:

A confidential or fiduciary relationship involves confidence and trust on one side and dominance and influence on the other.... Such a relationship exists as a matter of law [in classic fiduciary situations] and may exist in other cases where one party is heavily dependent upon the advice of another.

\* \* \* \* \* \*

A confidential relationship only goes to a situation where one party, because of some close relationship, relies very heavily on the judgment of another.

Most business relationships do not of themselves create fiduciary obligations (*Seaboard Seed Co. v. Bemis Co.,* 632 F.Supp. 1133, 1136 (N.D.Ill.1986), citing and quoting *Carey* ).

Nowhere in the Complaint do plaintiffs allege they had a close relationship with, or even knew, either Ostrow or Christoph. Nor are there allegations plaintiffs knew

(1) Ostrow had prepared the projections or (2) Christoph had prepared the Memorandum.[26] To some extent the Agreement itself tends to undercut the notion plaintiffs were heavily dependent on Ostrow or Christoph for advice:

9. The undersigned has consulted with and been guided by his personal investment advisor, attorney and/or accountant named below (herein collectively called the "Representative") with respect to and concerning the advisability of the purchase of the Partnership Interests hereby subscribed for (or if the space therefor is left blank, the undersigned warrants that he/she is capable of evaluating an investment in the Partnership Interest without the assistance of such an advisor) and has secured independent tax advice with respect to the investment contemplated hereby, on which he/she is solely relying.

\* \* \* \* \* \*

13. The undersigned expressly warrants that (a) either individually or together with his/her Representative, he/she has knowledge and experience in financial and business matters in general and in investments of the type described in the Memorandum in particular.

There has been some recent expansion in the recognition of fiduciary relationships—in cases, for example, where a lawyer is perceived as owing such duties to projected beneficiaries as well as to his or her client-testator under a will. And, again for example, *Morgan v. Prudential Group, Inc.,* 527 F.Supp. 957, 961 (S.D.N.Y.1981), *aff'd mem.,* 729 F.2d 1443 (2d Cir.1983) says (in a different context) "it can be argued with considerable force" that "a fiduciary or other special relationship" exists between tax counsel who prepare a tax opinion for a prospectus and prospective investors. But Illinois law has not even approached the lengths to which plaintiffs would extend it.

---

**26.** P/C Mem. 4 observes simply:

The Amended Complaint states special circumstances which take this case outside of a normal business relationship. Boydston, the general partner, is alleged to be merely a front for Christoph (¶ 13). [Note by this Court: That is made of whole cloth; their own ¶ 13 says nothing of the sort]. A scheme

to defraud is alleged between Christoph and Boydston (¶¶ 10, 11). Christoph provided the entire asset base of the limited partnership and prepared the prospectus (¶¶ 12–17). Thus, Christoph not only concocted the scheme; he was the direct beneficiary of the scheme.

Count 5 is dismissed for failure to state a cause of action.

### 4. *Illinois Securities Laws*

In Count 9 plaintiffs seek to rescind their purchases of interests in the Partnership under Section 137.13, alleging:

> 63. The acts and omissions complained of were perpetrated by defendants in their capacities as "controlling persons" of [the Partnership] within the meaning of the Illinois Securities Laws, Ill.Rev.Stat., Chapter 121–1/2, and as such were responsible to adequately disclose the true facts surrounding the Partnership set forth above.
>
> 64. Defendants sold to plaintiffs "securities" under said law.
>
> 65. By this action plaintiffs give notice of their election to rescind the sale of securities under Section 137.13A and B of said laws within six months of the date they learned that the sale of such securities was voidable, and hereby tender the securities to the defendants.

Each of Ostrow and Christoph resists the Count 9 rescission claim on the ground plaintiffs delayed more than six months before providing notification of rescission. Additionally Ostrow Mem. 14–15 urges Count 9 should be dismissed because:

> 1. No accounting firm is liable under Section 137.13.
>
> 2. Plaintiffs have not alleged the sales were consummated in Illinois.

This opinion treats first with the timeliness objection.

### 1. *Notice of Election To Rescind*

Under Section 137.13 a purchaser of a security sold in violation of the Illinois Securities Act may elect to rescind the sale if he or she provides (Section 137.13 B):

> Notice of any election [to rescind] ... within 6 months after the purchaser shall have knowledge that the sale of securities to him or her is voidable, to each person from whom recovery will be sought, ....

Although Ostrow and Christoph argue plaintiffs' claims are therefore barred by limitations, *Martin v. Orvis Brothers & Co.*, 25 Ill.App.3d 238, 246, 323 N.E.2d 73, 79 (1st Dist.1974) (citations omitted) explains:

> The six months rule regarding notice is not a statute of limitations, but rather, an equitable feature built into the statute to protect against stale claims. ... Its purpose is to prevent purchasers, who have sufficient knowledge of the remedy available to them, from waiting the entire statute of limitations to decide whether to elect rescission.

Both the statute and the *Martin* statement of its purpose look to when plaintiffs had "knowledge" their sales were voidable. On that issue the parties are of little assistance: They fight about the correct interpretation of ¶ 25 as to when plaintiffs learned the "true facts" about the economics of the farm.[27] But the date plaintiffs acquired that knowledge about the farm is relevant only to the extent it tends to prove plaintiffs had constructive knowledge of the voidability of their sales. *Buehl v. Dayson*, 127 Ill.App.3d 958, 965, 82 Ill.Dec. 869, 874–75, 469 N.E.2d 403, 408–09 (5th Dist.1984) explains:

> But the statute does not require actual knowledge that the sale is voidable, either. According to the *Martin* court, the six month notification period may run from the date that the purchaser acquires constructive knowledge of voidability, and actual knowledge of nonregistration [of a registrable security] is a factor in ascertaining the date of that constructive knowledge. Determining that date is a question of fact for the trial court.

It would of course be improper for this Court to resolve that factual question (whether plaintiffs had constructive knowl-

---

27. Christoph Mem. 6–7 reads ¶ 25 as alleging plaintiffs knew the "true facts" in March 1986. P/C Mem. 7 says the paragraph alleges plaintiffs "only became aware of the true facts regarding their investment shortly before filing the Complaint"—whenever "shortly before" is. Actually both readings of that paragraph are right, revealing the paragraph's internal inconsistency. Plaintiffs are ordered to amend ¶ 25 to state precisely when plaintiffs (or each plaintiff, if the dates differ) learned the "true facts" about the farm.

edge their purchases were voidable because they knew the "true facts" about the economics of the farm) against plaintiffs in this preliminary Rule 12(b)(6) motion. This Court denies the motions to dismiss Count 9 on that ground alone.

2. *Ostrow's Liability under Illinois Act § 137.13*

Section 137.13 limits the class of potential Illinois Blue Sky defendants to (Section 137.13 A):

> the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer or salesperson who shall have participated or aided in any way in making such sale, and in case such issuer, controlling person, underwriter or dealer is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making such sale....

Ostrow Mem. 14 urges Ostrow, an accounting firm, does not fall under any of those categories and should therefore be dismissed as a Count 9 defendant. P/O Mem. 20 retorts Ostrow "facilitated the sale of securities" and therefore qualifies as an "other person by ... whom said sale was made."

▆ Not surprisingly, plaintiffs are unable to cite any case law in support of that very broad reading of the statute. As this Court explained in *Excalibur Oil, Inc. v. Sullivan*, 616 F.Supp. 458, 466 (N.D.Ill. 1985), the Illinois Act is a "far more restrictively structured statute" than the 1933 and 1934 Acts. Only specifically defined classes of persons who regularly play central and specialized roles in securities transactions (and who under Section 137.8 must themselves be registered with the Secretary of State) may be subjected to Illinois Act liability. Ostrow is dismissed from the Section 137.13 claim.

*Conclusion*

This Court grants Ostrow's motion to be dismissed from Counts 1 (in part), 2 (in part), 5 and 9, and Christoph's motion to be dismissed from Counts 2 (in part) and 5 of plaintiffs' Amended Complaint. Those counts are dismissed, without prejudice to plaintiffs' curing of the pleading deficiencies outlined in this opinion. In all other respects the motions are denied.

To facilitate defendants' and this Court's dealing with a self-contained rather than a now-chopped-up pleading, and to cure the flaws in the still-remaining counts, plaintiffs are ordered in all events to file a Second Amended Complaint on or before April 30, 1987 stating all their still-viable claims. Defendants are ordered to answer or otherwise plead within 14 days after the Second Amended Complaint is delivered to their counsel.

SUPPLEMENTAL MEMO-
RANDUM ORDER

▆ This Court's April 20, 1987 memorandum opinion and order (the "Opinion," 658 F.Supp. 1378) dealt with a host of problems posed by dismissal motions filed by some of the defendants. This supplemental order deals with a change in the Opinion required by supervening law.

Before the Opinion was written, our Court of Appeals had announced a two-year statute of limitations applicable to all Illinois-based civil RICO actions (*Tellis v. United States Fidelity & Guaranty Co.*, 805 F.2d 741, 745–46 (7th Cir. 1986)). Since then, however, the United States Supreme Court has rejected all such state-derived limitations periods in favor of a uniform nationwide four-year statute (*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, ___ U.S. ___, 107 S.Ct. 2759, 96 L.Ed.2d ___ (1987)). This action was brought within four years after the date of every plaintiff's purchase of a limited partnership interest—and that was true no matter which of the alternative possible dates was ascribed to the "purchase," so it becomes unnecessary to indulge the "accrual" analysis found in the Opinion, 658 F.Supp. at 1390–92.

Accordingly those pages of the Opinion are superseded by a more simple analysis, though the result is the same. It may be put into a single sentence: Because each plaintiff's RICO claim was filed less than four years after Fox Briar's General Partner ac-

cepted that plaintiff's Agreement, every such claim was timely filed.

### Appendix

Ostrow Mem. 2–3 cites *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1004 (7th Cir.1984) for the proposition that even though the state statute of limitations must be applied to Section 10(b) and Rule 10b–5 claims, this Court should apply the federal doctrine of equitable tolling. But it sometimes happens in the law that a precedent is unreliable because it rests on an earlier case of doubtful validity—and then the later case gains unwarranted currency by sheer repeated citations, without any examination of its flawed underpinning. Unfortunately that is true of *Suslick.*

*Suslick* invoked *Tomera v. Galt*, 511 F.2d 504, 509 (7th Cir.1975) in support of the general rule of employing federally-created tolling concepts, while ignoring the plainly different mandate of *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)—decided by the Supreme Court a few months *after* our Court of Appeals' decision in *Tomera.* Actually, even before *Johnson* was decided *Tomera* was off the mark in saying (as a general proposition) that federal common law determines when a borrowed state statutory period commences. Examination of *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1945), the case *Tomera* cited in support of that proposition, reveals a much more narrow holding. *Holmberg, id.* at 395–96, 66 S.Ct. at 584 (citations omitted) held federal equitable doctrine applies to the enforcement of federal *equitable* rights:

> The present case concerns not only a federally-created right but a federal right for which the sole remedy is in equity.... When Congress leaves to the federal courts the formulation of remedial details, it can hardly expect them to break with historic principles of equity in the enforcement of federally-created equitable rights.
> Traditionally and for good reasons, statutes of limitations are not controlling measures of equitable relief. Such statutes have been drawn upon by equity solely for the light they may shed in determining that which is decisive for the

chancellor's intervention, namely, whether the plaintiff has inexcusably slept on his rights so as to make a decree against the defendant unfair.

Thus *Holmberg* does not authorize the application of federal tolling doctrine in *all* federal right cases—only those in which a plaintiff seeks equitable relief. Because plaintiffs in this case seek damages (not equitable relief) for the alleged Section 10(b) and Rule 10b–5 violations, *Johnson* controls and state tolling doctrine must be applied.

In fact, *Suslick*'s reliance on *Tomera* is all the more puzzling in light of the recognition later in *Suslick* (741 F.2d at 1005) of the correct proposition as reconfirmed by *Johnson:*

> The Supreme Court has held that where the federal courts adopt a state statute of limitations in the absence of a specific statute enacted by Congress, the courts must also adopt the state rules tolling that statute of limitations unless the rules are inconsistent with the Constitution and laws of the United States.

This should be contrasted with the concept that federal law (see Rule 3) determines when an action has been *commenced* for limitations purposes; see *Sentry Corp. v. Harris,* 802 F.2d 229, 236–37 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct.1624, 95 L.Ed.2d 199 (1987). Nonetheless some district courts in this Circuit continue to cite *Tomera* or *Suslick* and to apply the federal tolling rules enunciated in those cases without ever finding state tolling rules inconsistent with federal law. See, e.g., *Pirtle v. Gilman,* No. 86 C 3448, slip op. at 11 (N.D.Ill. Feb. 9, 1987) [Available on WESTLAW, DCT database]; *Renovitch v. Stewardship Concepts, Inc.,* 654 F.Supp. 353, 358 (N.D.Ill.1987); *Bachmeier v. Bank of Ravenswood,* No. 86 C 4433, slip op. at 8 (N.D.Ill. Jan. 12, 1987) [Available on WESTLAW, DCT database]; *Newman v. Wanland,* 651 F.Supp. 20, 22 (N.D.Ill. 1986).

Neither *Suslick* nor any of those cases has identified any predicate, where state law provides the rule of decision, for looking to *both* state and federal law notions of tolling. It is frankly better to recognize

*Suslick* for what it is: a mistaken detour from the path marked out by the Supreme Court in *Johnson.*

Parenthetically, that has not been the only mischief wrought by *Suslick.* It also mistakenly quoted the 1983–amended form of Rule 11 (741 F.2d at 1003 n. 3) even though it was called on to deal with potential sanctions for *pre*-amendment lawyer conduct. Consequently *Suslick*'s continued insistence on subjective bad faith as the predicate for Rule 11 liability (*id.* at 1007), coupled with its erroneous quotation of the amended version of the Rule, suggested to the reader the same subjective standard remained in effect under revised Rule 11. That mistake muddied the waters by creating a misleading impression—thus undoing the whole purpose of the amendment (see, e.g., this Court's opinion in *In re Ronco,* 105 F.R.D. 493, 494–97 (N.D.Ill. 1985)). It was not until *Rodgers v. Lincoln Towing, Inc.,* 771 F.2d 194, 205 (7th Cir.1985) that our Court of Appeals got into step with the other courts around the country by recognizing the intended Rule 11 shift to an objective standard for imposing sanctions on lawyer conduct (and by disclaiming *Suslick* on that score, without acknowledging its own mistaken footnote).