**Emmett BONFIELD, Plaintiff,**

v.

**AAMCO TRANSMISSIONS, INC., Defendant.**

**No. 88 C 7059.**

United States District Court, N.D. Illinois, E.D.

Feb. 15, 1989.

A.J. Hohman, Jr., Hope, Hohman & Georges, San Antonio, Tex., Timothy J. McGonegle, Ashcraft & Ashcraft, Ltd., Chicago, Ill., for plaintiff.

Marc P. Seidler, Myrna G. Baskin, Rudnick & Wolfe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Emmett Bonfield ("Bonfield") has sued AAMCO Transmissions, Inc. ("AAMCO"), asserting AAMCO had wronged him in a number of ways in connection with his purchase of an AAMCO franchise:

1. by violating the Illinois Franchise Disclosure Act ("Franchise Act"), Ill.Rev. Stat. ch. 121½, ¶ 721 (1985) [1];

2. by violating the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), Section 270a;

3. by breaching its fiduciary duty and its implied duty of good faith and fair dealing, both those duties assertedly being created by Illinois case law, and the implied covenant of good faith imposed by the Uniform Commercial Code ("UCC");

4. by imposing coercion, duress and operational control on Bonfield;

5. by committing common law fraud; and

6. by being negligent.

In response AAMCO has tendered a multi-pronged motion, seeking:

---

**1.** All further references to provisions of Chapter 121½ will simply take the form "Section—." This usage conforms to the internal statutory numbering of Illinois legislation, which employs the "§" symbol, rather than the Smith-Hurd use of the "¶" sign. Because the Bonfield–AAMCO transaction antedated 1988, citations are to the then-applicable version of the statute rather than to the Franchise Disclosure Act of 1987 (which took effect January 1, 1988).

1. to dismiss the fraud allegations (Counts I, II and IV) under Fed.R.Civ.P. ("Rule") 9(b);

2. to obtain summary judgment under Rule 56 on the Franchise Act claim;

3. to dismiss all remaining claims under Rule 12(b)(6); and

4. to strike Bonfield's claim for punitive damages.

For the reasons stated in this memorandum opinion and order, AAMCO's several motions are resolved in these terms:

1. Its Rule 9(b) motion is granted, though some of the allegations might be recast in a way that would withstand such a motion. That potential, however, is mooted by the remaining analysis of Bonfield's fraud-based claim.

2. Its summary judgment motion on the Count I Franchise Act claim is granted to the extent that claim is predicated on any purported AAMCO misrepresentation, while ruling is reserved to the extent the claim arises out of AAMCO's alleged omission. In any event, however, Bonfield cannot obtain rescission based on his Franchise Act claim.

3. Its Rule 12(b)(6) motion to dismiss the Count II Consumer Fraud Act claim is granted.

4. Its motion to dismiss the Count III claim for breach of fiduciary duty is granted, while its motion to dismiss the same Count's claim for breach of the implied duty of good faith and fair dealing is denied.

5. Its motion to dismiss the Count IV economic duress claim is granted.

6. Its motion to dismiss Count V's common law fraud claim is also granted.

7. Its motion to dismiss the Count VI negligence claim is granted as well.

8. Its motion to strike the punitive damages claims is granted.

Those motions will be dealt with in turn after the factual framework of Bonfield's Complaint is set out.

### Facts

Both the following factual statement and the case itself are potentially complicated by the dual nature of AAMCO's motions: for summary judgment *and* for dismissal of Bonfield's Complaint for failure to state claims. That situation calls for a somewhat extended prefatory background, which has occasioned this textual treatment in place of the explanatory procedural footnote this Court customarily includes at the beginning of the "Facts" section of each of its opinions.

As for the summary judgment phase of AAMCO's motion, familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court must draw from the parties' *evidentiary* submissions all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Bonfield (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

As for the other facet of AAMCO's motion, Rule 12(b)(6) principles require this Court to accept as true all of Bonfield's well-pleaded factual *allegations*, again drawing all reasonable inferences in his favor (*Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). For that purpose matters outside the Complaint may not be considered, though where such matters have been tendered by the plaintiff the last sentence of Rule 12(b) gives the court the option to convert the defendant's motion to one for summary judgment under Rule 56 (thus taking the evidentiary submissions into account).

Under the circumstances this section will set out the facts in the Rule 56 mode, rather than limiting itself to the Complaint's allegations. When this opinion turns to consideration of the Rule 12(b)(6) motion, however, only the pleading allegations will be considered (and any further explanation of the factual matrix for the ruling will be made at that time). With that understanding, it is time to address the facts.

In early 1986 Bonfield began searching for a new business venture—a "service type business" located close to his home (Bonfield Mem.Ex. H, at 7–8). After initially communicating with AAMCO's competitor Interstate Transmissions among other exploratory inquiries, Bonfield approached AAMCO. Its Account Executive Walter Marshall ("Marshall") met with Bonfield (*id.* at 8).

On July 9, 1986 Marshall provided Bonfield with franchise information on AAMCO's Mid–West Operations Group (*id.* at 2). Marshall told Bonfield about an available AAMCO franchise in Wheaton, Illinois (*id.;* Bonfield Mem.Ex. A ¶ 5). At that time the Wheaton franchisee was in bankruptcy.

Bonfield claims that in discussing the Wheaton center, Marshall told him the financial information on that location was inaccurate (Bonfield Mem.Ex. A ¶ 6). Marshall said the Wheaton center was unsuccessful because one of the owners had been cheating his partner—"the former owner was pocketing $1,000 per week" (*id.* ¶¶ 9–10). Marshall said the AAMCO franchise would "do" $450,000 in business per year (*id.* ¶ 11). Finally, Marshall also represented that (1) AAMCO enjoyed a good reputation in the industry, (2) it was noted for excellence in the transmission field, (3) its name carried valuable good will throughout the nation and (4) Bonfield would have a good probability of financial success (*id.* ¶ 4).

Based on those representations Bonfield began the process of obtaining an AAMCO franchise for the Wheaton center. During that process Bonfield was told he would have to assume responsibility for honoring warranties issued by the former owner of the Wheaton Center as well as those of other AAMCO franchisees. AAMCO and its franchisees refer to the honoring of those warranties as "come-backs" (*id.* ¶ 14).

Bonfield tried to quantify his potential liability for the "come-backs." AAMCO attorney Joel Rosen ("Rosen"), during the final stages of Bonfield's acquisition, represented that $5,000 would "be more than enough money" to cover those warranties (*id.* ¶ 16). AAMCO Manager of Franchise Administration Max Cades ("Cades") also said AAMCO "recommended" the $5,000 figure (Bonfield Mem.Ex. H, at 50–51).

On September 2 Bonfield began AAMCO's five-week Franchise Training School in Bala Cynwyd, Pennsylvania. On September 4 Bonfield executed a Franchise Agreement (the "Agreement") with AAMCO just before participating in an AAMCO "Board of Review" hearing. AAMCO always conducts those hearings to evaluate potential franchisees. As Cades explained to Bonfield, the awarding of a franchise is conditional upon Board approval (*id.* at 6).

As was its regular practice, AAMCO tape recorded Bonfield's review hearing. Here is what the transcript reflects as to the scope of AAMCO's representations (Tr. 4):

> CADES: Now, our purpose as best we can is to determine whether any applicant meets the requirements for a franchisee as we see it. Our concern is also whether or not we feel that person has a chance of being successful as an AAMCO operator. In turn, we want to make certain the provisions of the Franchise Agreement are understood. It is a contract. It means exactly what it says and Emmett, more then [sic] anything else, we want to insure that nobody, Walter Marshall or anybody else you discussed AAMCO with, that nobody has made any promises, commitments, representations or even statements to you that are not a fact. So, let me tell you how we're going to make certain of this. If it's not in the Franchise Agreement that you've signed dated today September 4, 1986 or if we don't cover it for you at this meeting this afternoon, either way, that would have no validity. Understood?
>
> BONFIELD: Uh–Hm.
>
> CADES: Since this is the official meeting with representatives of AAMCO Transmissions Incorporated, this is the meeting of record, this is when anything has to be laid upon the table. For you to say to us later, a week, a month, but, but, it doesn't really give us a lot of (cough). As we go along if you have any

questions in any area, feel free to raise the questions. Before we've finished, you can ask questions about anything that comes to mind. Our concern is simply that we want no surprises for you or for us. All right sir?

BONFIELD: I get that.

CADES: Okay, you hear me and you understand?

BONFIELD: I understand.

That oral caveat specifically reiterated what Agreement ¶ 23.1 (the conventional integration provision) had set out:

23.1 *Entire Agreement.* This Agreement consisting of 11 pages and attachments contains the entire agreement between the parties concerning Franchisee's AAMCO franchise; no promises, inducements or representations not contained in this Agreement shall be of any force or effect, or binding on the parties. Modifications of this Agreement must be in writing and signed by AAMCO.

Bonfield seeks to expand on the scope of AAMCO's actionable representations by these statements in his affidavit tendered as Ex. A to his memorandum on the current motion (Aff. ¶¶ 24–26):

24. The signing of the AAMCO Franchise Agreement and the discussions leading up to it were not recorded by AAMCO.

25. These conversations as well as other lengthy discussions took place before AAMCO representatives began recording the last portion of the meeting. I have reviewed a copy of what AAMCO alleges to be a transcript of the September 4 meeting. Such Board of Review Transcript is not a true and correct copy of the entire meeting. Numerous conversations were had before AAMCO began recording the remainder of the meeting.

26. During the unrecorded portion of the meeting, AAMCO's Walter Marshall again made specific representations that the Wheaton AAMCO center would make $450,000.00 per year. I executed the Franchise Agreement in reliance upon that representation. Only after I had executed the Franchise Agreement did AAMCO begin to record the remainder of the meeting.

Then Bonfield goes on (Aff. ¶¶ 27–31) to characterize certain aspects of what occurred during the recorded portion of the meeting. Because the transcript itself has been tendered to this Court (AAMCO Ex. B), it need not (and does not) accept Bonfield's mischaracterizations of the proceedings.[2] This opinion will treat with the relevant facts in the course of its substantive discussion on the law.

Events moved quickly after the Board of Review hearing. Cades notified Bonfield September 8 that he had been approved by the Board of Review "subject to completion of the AAMCO Training School and compliance with the other stated requirements" (Bonfield Mem.Ex. B). On September 30 the Texas Attorney General first advised AAMCO of the possibility of filing of a "Deceptive Trade Practices action and/or settlement of this office's claims" based on prior consumer complaints against AAMCO franchisees (Bonfield Mem.Ex. D). Bonfield completed his training school October 2.

On October 4 AAMCO received a letter from the Missouri Attorney General, sent

---

2. Indeed, a reading of the entire transcript compels the conclusion that for Bonfield to label AAMCO as guilty of material misrepresentations and misleading omissions is a classic instance of the pot calling the kettle black. Bonfield Aff. ¶¶ 27–31, though they pick out some snippets from the review hearing and report them with some (though not total) accuracy, really distort what went on in each of the subject areas discussed. Bonfield's selective excerpts are a graphic demonstration of what in the franchise disclosure field (drawn from the securities fraud field) is termed "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading" (Section 706). What the transcript plainly reflects is (1) a self-contained meeting between Bonfield and the Board of Review (evidenced in part by the Board members' having introduced themselves to Bonfield at the beginning of the tape-recorded session) and, more importantly, (2) a probing inquiry in which doubts were cast by Board members on numerous aspects of Bonfield's conclusions, to make certain he had relied on his own analysis in reaching those conclusions and was comfortable that his analysis was right.

on behalf of the Attorneys General of Missouri and nine other states (including Texas but not including Illinois), identifying perceived "problem areas" based on consumer complaints against AAMCO franchisees (Bonfield Mem.Ex. E, at [1][3]). AAMCO first met with the various Attorneys General on October 29–30.

Meanwhile Bonfield had moved ahead on seeking Bankruptcy Court approval of his purchase of the Wheaton center. That approval was given November 3, and Bonfield closed the deal November 17 and began operating the AAMCO franchise in Wheaton.

AAMCO continued its discussions with the Attorneys General, meeting on November 18 in New York City, December 8–9 in Boston and December 29–30 in Madison, Wisconsin (Bonfield Mem.Ex. E, at [3]). AAMCO ultimately entered into "stipulated final judgments" with the Attorneys General of 14 states (Illinois was not among them) on February 18, 1987. Because no actions had previously been filed in any court against AAMCO, the settlement took the form of the simultaneous filing of complaints and entry of the stipulated final judgments. Thus the cases were filed and settled the same day (AAMCO Mem.Ex. A ¶ 5).

Cades formally notified Bonfield March 3, 1987 that he had completed all of AAMCO's requirements. Cades forwarded an executed copy of the Agreement (Bonfield Mem.Ex. C) to Bonfield.

Bonfield's first complaint against AAMCO was filed in this District Court January 14, 1988. On January 19 this Court dismissed the action sua sponte for lack of subject matter jurisdiction, but it gave Bonfield until January 29 to replead. Bonfield chose not to file an amended complaint. Instead he later filed this new action August 15, 1988.

**3.** Bonfield Mem. Ex. E has no page numbers. This opinion has therefore supplied the numbers but indicates them with brackets.

**4.** As the later discussion will reflect, Bonfield's fraud-based claims fail to survive for substantive reasons—and because those reasons draw on the litigants' evidentiary submissions rather than the Complaint alone, Bonfield's pleading

### Rule 9(b) Motion [4]

AAMCO Mem. 12–13 asserts Bonfield did not plead fraud with the particularity required by Rule 9(b). Bonfield has alleged fraudulent misrepresentation (or more accurately, both misrepresentations and omissions of material fact) in three of his claims—both those under the Franchise Act and the Consumer Fraud Act and the separate charge of common law fraud (Counts I, II and V):

1. Complaint ¶ 10 says AAMCO expressly represented Bonfield's expenses in honoring the "come-backs" would not exceed $5,000. Later Complaint ¶ 24 says Bonfield has actually incurred expenses of $25,000–$35,000.

2. Complaint ¶ 25 says AAMCO failed to reveal the claims by the various Attorneys General.

3. Complaint ¶ 7 says AAMCO made representations as to:

> AAMCO's good reputation in the industry, its excellence in the transmission field, its valuable good will and Bonfield's probabilities for financial success as an owner of AAMCO's franchises.

Oddly enough, though Bonfield labels each of those matters as "material facts" (Complaint ¶ 26), he does not say anywhere that the alleged "come-backs" representation was false when it was made, and he does not charge in his first two fraud-based claims (Counts I and II) that the representations listed in Complaint ¶ 7 were false—that allegation comes only in Count V ¶ 29, as part of the common law fraud claim. Those omissions are obviously the result of careless errors, readily curable by repleading. In the interest of expedition, then, this opinion will treat each of the fraud claims as though they had alleged the falsity of the matters involved.

deficiencies might well be treated as moot. However, because of the already-discussed hybrid nature of AAMCO's motion (see the beginning of the "Facts" section in the text), this opinion will put Bonfield's fraud-based claims in a proper context as a pleading matter before turning to their substantive viability.

This characterization of AAMCO's claimed misrepresentations and omissions has deliberately left out any specific reference to Bonfield's claim, not set out in the Complaint but now (at the briefing stage) made a major focus of his argument, that Marshall represented on a number of occasions during their early discussions that the Wheaton center would "do" $450,000 in business per year (Bonfield Mem.Ex. A ¶¶ 11–12).[5] At least in terms of the Complaint, Bonfield never adverts to that as a representation, let alone labeling it as false. For current purposes, then, the best Bonfield can expect is that any such statements are subsumed in his Complaint ¶ 7's general reference to "AAMCO's representatives [having] made express representations to BONFIELD concerning ... BONFIELD's probabilities for financial success as an owner of one of AAMCO's franchises."

This Court has often addressed the requirements imposed by Rule 9(b) (see, e.g., *Flournoy v. Peyson*, 701 F.Supp. 1370, 1374 (N.D.Ill.1988) for an extended discussion of the "particularity" requirement). In *Gutfreund v. Christoph*, 658 F.Supp. 1378, 1384 (N.D.Ill.1987)[6] this Court pointed out that the Rule calls not for particularity as to legal theories but rather as to the "circumstances constituting fraud," a concept fleshed out in the following terms in 5 Wright & Miller, *Federal Practice and Procedure: Civil* § 1297, at 403 (1969):

> matters such as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.

In the same securities fraud context, this Court has also said (*Caliber Partners, Ltd.*

*v. Affeld*, 583 F.Supp. 1308, 1311 (N.D.Ill. 1984) (citations omitted)):

> To plead a cause of action for fraud, plaintiffs need not allege evidentiary details that will be used to support the claim at a later date.... They need only set forth the basic outline of the scheme, who made what misrepresentations and the general time and place of such misrepresentations.

Certainly the application of those standards to the Complaint ¶ 7 allegation as to "probabilities for financial success" yields only one possible conclusion: It fails the test. Even if Bonfield were given the benefit of the post-Complaint evidentiary submissions (something to which he is not entitled, see *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)) in judging the adequacy of his Complaint, he has not done the job. If the evidentiary submission is looked at to any extent, it must be viewed in its totality. There is no way in which the discussion at the Board of Review meeting (which it will be recalled Bonfield was expressly told was all he could rely on) could be characterized as a representation regarding his probable financial success as a franchisee: Quite to the contrary, the entire thrust of the discussion was to cast doubt on Bonfield's independently-arrived-at projections (both the $450,000 gross volume and any projection of net income) and to probe as to his basis for having made them. Hence the Complaint ¶ 7 allegation in that respect must be stricken under Rule 9(b) (cf. *Mutuelle Generale Francaise Vie v. Life Assurance Co. of Pennsylvania*, 688 F.Supp. 386, 393 (N.D.Ill.1988)).

As for Bonfield's remaining Complaint ¶ 7 allegations and those in Complaint ¶ 10,

---

**5.** Bonfield muddies the waters somewhat by then asserting (*id.* ¶ 26) Marshall had represented on September 4, 1986 (before the taped Board of Review meeting) that the Wheaton center would "make" $450,000 a year—normally a reference to net profit rather than the gross revenues implied by what the franchise would "do." It is plain from a review of the transcript that all references to Bonfield's potential in operating the Wheaton Center—a subject pursued at great length during the Board of Review meeting in terms of pressing Bonfield as to what basis *he* had for arriving at the $450,000

figure in light of the much lower reported volume of the then-existing franchisee who had gone into bankruptcy, and not at all in the context of any representation made *to* Bonfield by AAMCO's people—were always in terms of gross receipts and not net income.

**6.** *Gutfreund* was written in the securities fraud context, which (as the discussion later in this opinion indicates) is particularly analogous to claims under the Franchise Act.

those arguably stand on a somewhat different footing. In terms of the Complaint alone, those allegations would also fail Rule 9(b)'s test. For instance, Complaint ¶ 10 does not say who made the alleged "come-backs" misrepresentation nor does it specify in any meaningful way where and when it was made.

As to those matters, however, the possibility seems to exist that a particularization of the Complaint via the matters Bonfield has tendered by evidentiary submissions on the current motion might provide the information necessary to satisfy the Rule. For instance, Bonfield says while he was "finalizing [sic] the acquisition of the Wheaton AAMCO center," Rosen told him and his lawyer that "$5,000 would 'be more than enough money' to cover the outstanding warranties"—the "come-backs" (Bonfield Mem.Ex. A ¶ 16).[7]

Finally, Bonfield's Complaint ¶ 25 allegation is really not subject to Rule 9(b) analysis. Like Sherlock Holmes' dog that did not bark in the night, an actionable omission obviously cannot be particularized as to "the time, place, and contents of the false representations" or "the identity of the person making the misrepresentation." It really does not matter, then, that Bonfield's evidentiary submissions (though not his Complaint) set out the circumstances surrounding the alleged omission regarding the investigations by the Attorneys General—both the dates and the locations of key events in AAMCO's negotiations with the various Attorneys General.

In sum, part of Bonfield's fraud-based allegations could not survive Rule 9(b) scrutiny even on the assumption they might be beefed up by his current evidentiary submissions, while the remaining allegations are flawed in Rule 9(b) terms but might be salvaged if the particularity provided by those submissions were inserted into the Complaint. As the following sections of this opinion reflect, however, the potential viability of Bonfield's fraud-based claims in pleading terms is really mooted, because those claims do not survive summary judgment analysis.

### Summary Judgment Motion

AAMCO Mem. 4–5 says summary judgment is appropriate on Bonfield's claim under the Franchise Act (Count I) because the events giving rise to the Attorney General's investigation occurred after Bonfield executed the Agreement. AAMCO's Memorandum (which devotes only a single paragraph to the subject) is inadequate in more than one respect:

1. It cites no authority at all for the just-stated proposition.

2. It does not even address the other potentially viable misrepresentation claims, such as that based on the alleged misstatements as to the expense of "come-backs" (see Complaint ¶ 10).

Although any approach to the topic based on AAMCO's arguments alone would thus lack something in logical analytical terms, this section will deal with both AAMCO's asserted nondisclosure of the Attorneys General situation and the asserted "come-backs" misrepresentation.

### 1. Misstatement/Omission Analysis

Like other franchise disclosure statutes, the Illinois Franchise Act was adopted to deal with the perceived "substantial losses" suffered by Illinois residents where franchisors fail to provide full and complete information regarding the franchisor-franchisee relationship" (Section 702(1)). Modeled after the federal securities laws, the Franchise Act is intended to "provide each

---

7. Bonfield's affidavit (id. ¶ 31) goes on to imply that Cades confirmed the adequacy of that figure during the September 4, 1986 Board of Review hearing. But a reading of the transcript itself (Tr. 50–54) reflects that was not so at all—again Bonfield was asked (not told) about the adequacy of the $5,000 figure he had arrived at with the seller of the Wheaton franchise in the situation he was about to get into (as part of an explanation to Bonfield of his exposure to liability for such warranties by his precedessor or other franchisees), and Cades simply told him $5,000 for a year was "the figure we, we normally recommend" (Tr. 54). Nothing suggests that statement was either false or was misleading as to AAMCO's general knowledge or experience on the subject. And the transcript (Tr. 56–57) negates any Bonfield reliance on AAMCO's purported "representation."

prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered for sale" (Section 702(2)(a)).

In outlawing fraudulent practices, Section 706 parrots the language of SEC Rule 10b–5, which draws its authority from Securities Exchange Act of 1934 ("1934 Act") § 10(b), 15 U.S.C. § 78j(b).[8] Thus, although Illinois courts have rarely discussed the Franchise Act (see, e.g., *Proimos v. Fair Automotive Repair, Inc.*, 808 F.2d 1273, 1276 (7th Cir.1987);) *Popeyes, Inc. v. Shapiro,* 1987 U.S.Dist. LEXIS 13636, at 14 n. 1 (N.D.Ill.) (opinion by Magistrate Lefkow, adopted by Judge Bua Sept. 1, 1987), this Court is not without guidance in evaluating Bonfield's claim. Given the model on which Section 706 is drawn, it is more than reasonable to look to traditional Rule 10b–5 principles (*Proimos,* 808 F.2d at 1276–77).

■ Here Bonfield claims AAMCO's asserted misstatement regarding "come-backs" was material and thus violated Section 706(1)(b). That alleged misstatement (by Rosen) was made before execution of the Agreement and may fairly be viewed as having been made "in connection with the offer or sale" of the franchise. And when it was made it may also be considered to have met the test of materiality set out in *Proimos, id.* at 1277 (citing *TSC Industries, Inc. v. Northway,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2131–32, 48 L.Ed.2d 757 (1976)):

> The materiality of a statement or omission depends on context; a statement is material if a reasonable investor would have considered it important in deciding how to act ...

Bonfield's claim must nevertheless lose in those terms because he cannot show justifiable reliance—an element required in every claim based on misrepresentations.

If "justifiable" and "reliance" were viewed as a twofold standard, Bonfield would fail both halves, though in that respect *Rowe v. Maremont Corp.,* 850 F.2d 1226, 1233 (7th Cir.1988) teaches:

> Courts have traditionally held that a plaintiff's reliance must be reasonable or "justifiable." *See* Thomas Hazen, *Securities Regulation* § 13.5, at 464–65. But in *Flamm v. Eberstadt,* 814 F.2d 1169 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 157, 98 L.Ed.2d 112 (1987), we stated that " 'reliance' means only materiality and causation in conjunction," and that reliance is no longer "an element independent of causation and materiality in a case under Rule 10b–5." *Id.* at 1173, 1174; *see also Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 527–30 (7th Cir.1985).

Materiality of the level of anticipated "come-backs" is thus not enough—*causation* is also an essential component of a Franchise Act claim under the parallel Rule 10b–5 standards. And for that purpose it is wholly unnecessary, in this case, to enter the murky waters of the debate as to "transaction causation" and "loss causation" as defined in *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928, 931 (7th Cir.1988):

> "Loss causation" means that the investor would not have suffered a loss if the facts were what he believed them to be; "transaction causation" means that the investor would not have engaged in the transaction had the other party made truthful statements at the time required.

Because those terms have proved confusing in their application, *LHLC, id.* (emphasis in original) suggests "the appropriate inquiry is whether the information disclosed or withheld affected an *investment*

---

**8.** Section 706(1) reads:

It is unlawful for any person, in connection with the offer or sale of any franchise, to directly or indirectly:

(a) Employ any device, scheme, or artifice to defraud;

(b) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

(c) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

decision." [9]

As a matter of law Bonfield—even apart from his being an experienced businessman and investor, from his own account to the Board of Review—is foreclosed from contending the claimed misstatement, made during his investigation and negotiation of the Wheaton deal, affected his investment decision. That is so because during the Board of Review hearing AAMCO explicitly told Bonfield—and he explicitly acknowledged—that anything not contained in the Agreement or covered in that hearing could not be considered as a valid representation by AAMCO (AAMCO Mem.Ex. B at 4, quoted in the "Facts" section of this opinion). And that unequivocal front-end statement of the contractual ground rules was both echoed and supplemented near the very end of the hearing (*id.* at 56):

> CADES: Let me ask you something. It might not be too positive, but I want you to tell me positively that you haven't anything here that contradicts anything you heard before.
>
> BONFIELD: No, that's true.
>
> CADES: That's good. That's the way it should be.
>
> BONFIELD: No, I hadn't.

Indeed, the absence of justifiable reliance is reinforced by the discussion of "comebacks" during the hearing, for Bonfield really gave the lie to his present attribution of the $5,000 figure to a representation by AAMCO's people. When Cades pressed Bonfield on where he got the $5,000 number for the "come-backs," the conversation went like this (*id.* at 51):

> BONFIELD: That was inserted by your people too I believe.
>
> CADES: We inserted it?
>
> BONFIELD: Well, I was concerned about that, and ah, when ah, I got the new ...
>
> CADES: We couldn't insert it.
>
> BONFIELD: Well, I ...
>
> CADES: It's your agreement with them.

> BONFIELD: Well, no, no, no. What I'm saying is I think the wording or something came from you because when I trus ...
>
> CADES: Oh yea, we recommend that you do this.
>
> BONFIELD: Oh, okay. Okay.
>
> CADES: We recommend that everybody does it ...

Then Cades asked Bonfield whether the Wheaton center "gets many comebacks?" and Bonfield replied (*id.* at 52):

> BONFIELD: I didn't get, I, no let me say this I didn't get an answer at all. I got answers to the fact that they didn't know, and so I and so I, and I, I never could get an exact answer, but, I, I took that to mean somewhat that if it was excessive ...
>
> CADES: Um-hm.
>
> BONFIELD: ... it would have been common knowledge in ah ...
>
> CADES: I wouldn't think so.

Finally Bonfield himself indicated he had *not* gotten the $5,000 figure from AAMCO (*id.* at 56–57):

> CADES: ... What, based on the information you ascertain, you think the $5,000.00 is enough?
>
> BONFIELD: I have, frankly, I have no real good way of knowing. Ah, from, I yea I've talked to ah, I talked to some of the fellows in the, in the class with me and ah you know they seem to think, that's the figure I've agreed to so you know, now, it's water over the dam. I mean, you know ...

That statement is eloquent in its silence: It neither says AAMCO's representatives provided the $5,000 figure nor even suggests Bonfield was basing his judgment on information provided by AAMCO representatives.

Two points stem from that extended colloquy. First, Bonfield's present version of the specific $5,000 figure as having come as an AAMCO representation (as contrasted with AAMCO's simply recommending that every AAMCO franchise buyer obtain

---

**9.** For a recent discussion of the conflicting views as to transaction causation vs. (or plus) loss causation, see the opinion of this Court's colleague Honorable Brian Duff in *Bastian v. Petren Resources Corp.*, 681 F.Supp. 530, 533–36 (N.D.Ill.1988).

an adequate reserve for "come-backs" in the negotiations with his or her seller) plainly appears an example of wishful thinking. But even if that were charitably viewed as a factual dispute, what is critical and uncontroverted is that Cades' disclaimers leave no doubt that Bonfield could not justifiably rely on the alleged misrepresentations (if any there were): Cades said and Bonfield agreed that anything told to Bonfield before the hearing had no validity, and Bonfield confirmed that nothing in the hearing contradicted anything he had heard before.

To let Bonfield now claim that, in spite of all that, he was relying on an earlier alleged misrepresentation would undercut the free-market principles that underlie our law of contracts. Statutes such as the Franchise Act (and its progenitor, Rule 10b–5) work a dramatic change in caveat emptor notions—but they do not repeal freedom-of-contract doctrines in the manner Bonfield would seek to do here. As a matter of both fact and law, the alleged misrepresentation as to "come-backs" did not affect Bonfield's "investment decision."

That same analysis applies to Bonfield's more general Complaint ¶ 7 allegations. Those asserted misrepresentations were also made during the negotiation process (and hence were "in connection with" Bonfield's purchase). And they might also arguably satisfy the materiality requirement outlined in *Proimos*, 808 F.2d at 1277. But again Bonfield has not shown the required justifiable reliance, and that dooms his claim.

■ One final point merits only enough discussion to state it and then reject it out of hand. Bonfield says he did rely on the claimed earlier misstatements because he signed the Agreement *before* the Board of Review hearing. Thus, the argument goes, any disclaimer by AAMCO came too late because he had already signed the Agreement.

That of course is arrant nonsense. Because the whole purpose of the Board of Review hearing was to serve as the basis for AAMCO's decision as to Bonfield's acceptability as a franchisee, and on the other side of the coin to confirm for Bonfield what he could and could not rely upon, Bonfield of course knew that his signing the document first had no independent legal effect. It is disingenuous for him now to ascribe any significance to the timing of his putting pen to paper—before rather than after the hearing.

In sum, Bonfield's misrepresentation-based claims must be rejected. That analysis does not dispose of his material omission argument, however. There the gist of his claim is that the ongoing investigations by the Attorneys General were material facts that should have been disclosed to him. Bonfield alleges [10] the judgment entered into by AAMCO created "adverse publicity" (Complaint ¶ 20) and the new requirements AAMCO imposed on its franchisees to implement the judgment "put him at a severe competitive disadvantage with customers" (Complaint ¶ 22). Together those two factors "caused a very serious, continuing erosion of the franchise owned by Bonfield" (*id.*).

AAMCO says that acknowledged omission cannot be actionable because Bonfield executed the Agreement *before* AAMCO

---

10. It will be noted that this discussion of Bonfield's claim of a material omission refers to the Complaint's allegations and not to the parties' evidentiary submissions. That has to be done because AAMCO's motion addressed to Count I, though framed as a Rule 56 motion, is not treated that way at all: Neither litigant offers any evidence at all either countering or supporting Bonfield's allegations as to the effect of the nondisclosure on his position as a franchisee. Thus the ill-thought-through Rule 56 motion and its response leaves this Court in the anomalous position of having no factual submissions from either side on the one claim purportedly attacked by a summary judgment motion, while having been furnished plenty of factual input on claims nominally challenged under Rule 12(b)(6). This Court might well react to such inadequacy of analysis (on both sides) by sending counsel back to the drawing board or by finding Bonfield must lose under Rule 56 because he has not supported an essential element of his claim in factual terms (see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). As the following textual discussion reflects, however, Bonfield's claim fails even apart from that deficiency of proof.

ever learned of the investigations.[11]  As AAMCO Mem. 5 put it:

> AAMCO could not have disclosed to Bonfield what it did not even know at that time, and it necessarily follows that AAMCO is entitled to summary judgment on Count I of the Complaint.

Bonfield responds that execution of the Agreement did not end AAMCO's disclosure obligations.  Bonfield Mem. 6 says "[d]espite execution of the AAMCO Franchise Agreement" he had to satisfy a number of additional requirements before he received his franchise.  Among other things he:

> 1.  needed approval by the Board of Review,
>
> 2.  was required to provide a copy of the buy-sell agreement purchasing the Wheaton center and
>
> 3.  was required to notify AAMCO of the first repair order number he used.

According to Bonfield Mem. 7 he:

> did not officially begin operations until AAMCO's approval on November 17, 1986 and did not officially become an AAMCO franchisee until final acceptance was made by AAMCO on March 3, 1987.

Bonfield's position is opaque at best.  It is unclear just what he means by the term "officially" in his double usage of that term—once when he speaks of beginning operations and a second time when he speaks of becoming a franchisee (let alone just how it is possible for the former to precede the latter by over 100 days).  Surely the absence of "official" status cannot connote Bonfield's continuing right to terminate his relationship until AAMCO's "final" approval on March 3, 1987—after all, Bonfield admits he had knowledge of the Attorneys General's investigations on February 18, 1987 (Bonfield Mem.Ex. A ¶ 47). If he really did have the power to terminate until March 3, he leaves unexplained why he did not do so then (or why he has not waived his claim by failing to do so).

That puzzle aside, Bonfield's position poses an interesting issue (one not fully addressed by the parties): When does a franchisor's disclosure obligation under Section 706 end?  AAMCO R.Mem. 4 insists the date of execution of the Agreement controls.  It points to the Section 704(2) requirement that the franchisor must provide the prospective franchisee with a copy of the disclosure statement filed with the Franchise Act's Administrator at least seven days before execution of the franchise agreement.  While Section 704(2) does not cross-refer to Section 706, it does raise an inference that the legislative intent was to view execution of the franchise agreement as the relevant event—presumably on the basis that the franchisee is then committed to the transaction.  After all, the statutory provision imposes no continuing obligation *after* execution takes place.

Because of the already-noted paucity of Illinois case law dealing with the Franchise Act, no guidance has been found there. But analogous Illinois cases addressing the Illinois Securities Law ("Blue Sky Law," Sections 137.1 ff) may be helpful.  Like the Franchise Act, the Blue Sky Law's fraud sections (Section 137.12(F), (G) and (I)) parrot the language of SEC Rule 10b-5.  Each of those provisions prohibits fraud "in connection with the purchase or sale" of securities, a concept potentially analogous to the one at issue here.

Illinois courts have addressed the "date of sale" question for statute of limitations purposes (see, e.g., *Frantzve v. Joseph*, 150 Ill.App.3d 850, 852, 104 Ill.Dec. 133, 134, 502 N.E.2d 396, 397 (1st Dist.1986) and cases cited therein).  In that respect *Frantzve, id.* at 852, 104 Ill.Dec. at 135, 502 N.E.2d at 398 said:

> In considering what constitutes the date of sale, the court has focused upon the date on which the plaintiff acquires a legal interest in the alleged securities

---

**11.**  Bonfield Mem. 10 suggests AAMCO may have known about the investigation as early as April 15, 1986, when its attorneys met with the Texas Attorney General.  But Bonfield Mem. Ex. D clearly shows that meeting took place "before any notice of any kind to AAMCO of any possible action" by the Attorney General.  Hence Bonfield's suggestion is unsupported by the evidence.

and the date when the rights of the parties to the transaction are fixed.

\* \* \* \* \* \*

[P]laintiffs in this case acquired a direct and unqualified legal interest in the joint venture at the time of the execution of the agreement and payment of the purchase price.

Ordinarily the securities buyer's obligations are fixed by making the formal commitment to purchase—by signing the agreement of purchase and sale. But ordinarily the securities seller's obligations are fixed at exactly the same time. That is not necessarily true in the franchise situation. Here Bonfield signed the Agreement—he made his investment decision—on September 4, 1986. It is not at all unusual that he still had to satisfy a number of conditions after executing the document, and that his failure to do so would have allowed AAMCO to reject him as a franchisee. That however is not necessarily determinative: Even if some or all the conditions involved were viewed as conditions precedent rather than conditions subsequent to AAMCO's being obligated, the law of contracts no longer adheres slavishly to mutuality of obligation as the universal test.

■ Once again it must be stressed that the purpose of the Franchise Act, like that of the federal and state securities laws, is to provide all the information necessary to the making of an intelligent investment decision. Once that decision has been made, no statutory purpose is served by requiring a continuing disclosure obligation. But what the parties have failed to

do here is to provide any basis for deciding whether the scenario here—one that has to be encountered frequently in relationships such as franchisor-franchisee, though not ordinarily between the seller and purchaser of securities—calls for notions of an ongoing investment decision and hence an ongoing disclosure obligation. That unanswered question controls Bonfield's claim based on the asserted material omission.

This Court must therefore reserve ruling on that aspect of the current motion. At the next status date the parties will be expected to discuss the procedure for disposition of this important tag end.[12]

### 2. *Rescission*

Bonfield also invokes Section 721(2) as the predicate for his attempted rescission of the Agreement. Specifically, Section 721(2)(a) says:

> Every sale of a franchise made in violation of this Act shall be voidable at the election of the franchisee or subfranchisor as provided in subsection (b) of this Section.

Subsection (b) then provides:

> Notice of any election provided for in paragraph (a) of this Section shall be given by the franchisee or subfranchisor within 90 days after the franchisee or subfranchisor shall have knowledge of a violation of this Act to each person from whom recovery will be sought....

AAMCO Mem. 6 says Bonfield has failed to comply with the 90–day notice requirement,[13] entitling AAMCO to summary judg-

---

**12.** This undecided question links up closely with another open issue: the materiality vel non of the nondisclosure involved here. After all, even if Bonfield can successfully extend the key date for disclosure purposes past the September 4, 1986 execution of the Agreement, there would appear to be a substantial difference between the critical date being that of the Board of Review's approval (or communicated approval) of him as a franchisee—perhaps on conventional offer-and-acceptance notions—and the later dates when he performed other conditions totally within his control (such as furnishing AAMCO a copy of his buy-sell agreement and his first repair order number). It would be extraordinary indeed to treat Bonfield as though he had a continuing option while he decided whether to

do those things he was obligated to do, with the consequence that a continuing "investment decision" was taking place on his part so as to create a correlative disclosure obligation on AAMCO's part. And depending on what the key date turned out to be, the materiality or nonmateriality of AAMCO's then-existing state of affairs with the Attorneys General could be dramatically different—and it might or might not pose a genuine issue of material (that is, potentially outcome-determinative) fact.

**13.** There is no 90–day notice provision in the Franchise Disclosure Act of 1987, which took effect January 1, 1988. However, new Section 1728 provides:

ment.[14]

Bonfield responds with several arguments. As the following discussion reflects, none has any persuasive force whatever.

■ First Bonfield says he did comply with the notice requirements when his former attorney, David Goodson, wrote to AAMCO on June 5, 1987 (AAMCO Mem.Ex. C). But that letter does not even mention the word "rescission" and provides no notice of any kind. All it said was this:

My client feels that he has been defrauded and a review of the Ill. Franchise Act and common law fraud cases leads me to only one conclusion, and that is that this matter be investigated thoroughly and resolved promptly.

Any claim of compliance with the statutory notice provision is really irresponsible.

■ In the alternative Bonfield says failure to comply with the 90–day notice requirement does not doom his claim. His Mem. 12 asserts:

1. His claim is not time-barred because the 90–day feature is an "equitable" requirement built into the statute to protect against stale claims.

2. Illinois courts do not bar rescission actions for noncompliance with the notice provision.

On the first point Bonfield says the Franchise Act has a separate three-year statute of limitations (Section 722). That of course is a total non sequitur. AAMCO does not

contend the statutory action itself is time barred but rather that one precondition to a particular statutory remedy has not been met.[15]

Bonfield is equally incorrect on the second point. No Illinois case (including the one cited by Bonfield, *Geri's West, Inc. v. Ferrall*, 153 Ill.App.3d 579, 106 Ill.Dec. 557, 505 N.E.2d 1348 (2d Dist.1987)) stands for the proposition that a party can maintain a rescission action despite failure to comply with the notice requirement. Any such holding would flout the clear statutory language—as *Proimos*, 808 F.2d at 1276 says:

But the right to rescission lasts only 90 days after the franchisee "shall have knowledge of a violation of this Act," ¶ 721(2)(b).

■ Clearly, then, Bonfield had to comply with the 90–day notice requirement. That shifts the inquiry to when Bonfield acquired "knowledge of a violation" and when he first informed AAMCO of his election to rescind.

As to the first question, *Port City Leasing v. Loffredo*, 114 Ill.App.3d 775, 778, 70 Ill.Dec. 560, 563, 449 N.E.2d 907, 910 (1st Dist.1983) teaches:

We have previously held that knowledge of Franchise Disclosure Act violations presents mixed questions of law and fact on which laymen are entitled to acquire their first knowledge from an attorney.[16]

---

Prior law exclusively governs all suits, actions, prosecutions, or proceedings which are pending or may be initiated on the basis of facts or circumstances occurring before the effective date of this Act.

Because all the events in this case occurred in 1986 and 1987, the earlier version of the Franchise Act controls.

**14.** AAMCO Mem. 6 uses the term "dismissal" rather than summary judgment. Because evidentiary materials were submitted and taken into account, the motion will be treated as one for summary judgment in accordance with Rule 12(b)'s last sentence.

**15.** Bonfield's citation to this Court's opinion in *Gutfreund*, 658 F.Supp. at 1396 reflects an inability (or more likely unwillingness) to read case law as well as statutes. *Gutfreund* addressed a similar notice of election to rescind in the Blue Sky Law (Section 137.13). This Court

quoted from *Martin v. Orvis Brothers & Co.*, 25 Ill.App.3d 238, 246, 323 N.E.2d 73, 79 (1st Dist. 1974) (citations omitted):

The six months rule regarding notice is not a statute of limitations, but rather, an equitable feature built into the statute to protect against stale claims.... Its purpose is to prevent purchasers, who have sufficient knowledge of the remedy available to them, from waiting the entire statute of limitations to decide whether to elect rescission.

That language clearly explains why Bonfield is wrong rather than right as to the comparable notice requirement in the Franchise Act.

**16.** [Footnote by this Court] See also *Marathon Petroleum Co. v. LoBosco*, 623 F.Supp. 129, 134 (N.D.Ill.1985), applying *Port Leasing* to deny summary judgment on the Section 721(2)(b) issue.

As already indicated, Bonfield had met with his lawyer before June 5, 1987. Though the lawyer's letter of that date to AAMCO was not a rescission notice, it specifically referred to a claim for fraud and to counsel's having "reviewed" the Franchise Act. Bonfield had thus acquired "knowledge" not later than June 5, 1987.

Despite that knowledge Bonfield did not notify AAMCO of any intention to rescind until he filed his initial complaint on January 14, 1988. That lapse of far more than 90 days bars rescission under Section 721(2), and summary judgment is granted on that claim.[17]

### Motion To Dismiss

As stated at the outset of this opinion, AAMCO has also moved to dismiss all remaining claims under Rule 12(b)(6). They will be dealt with in turn.

### 1. *Count II*

■ AAMCO Mem. 13–14 says Bonfield's Consumer Fraud Act claim "must be dismissed because he has not alleged, nor can he allege, consumer injury as a result of AAMCO's alleged fraudulent conduct." That position reflects the law with total accuracy.

*Newman–Green, Inc. v. Alfonzo–Larrain R.*, 590 F.Supp. 1083, 1087 (N.D.Ill. 1984) held every Consumer Fraud Act claim requires "an effect on consumers generally." It is not enough to show a single course of deceptive conduct by a defendant toward a plaintiff:

[P]laintiff must show defendant has engaged in deceptive practices in promoting its goods or services to its market in general.

When this Court authored *Newman–Green*, there were few reported Illinois Appellate Court opinions in the area, and none from the Illinois Supreme Court. Today the latter court still has not spoken to the issue, but it is now unquestionable that *Newman–Green* represents the accepted Illinois Appellate Court interpretation of the Consumer Fraud Act.

■ Just last year the Appellate Court for the First District reaffirmed that principle in *Blake v. State Farm Mutual Automobile Insurance Co.*, 168 Ill.App.3d 918, 119 Ill.Dec. 617, 523 N.E.2d 85 (1st Dist. 1988).[18] Citing the same cases this Court had relied upon in *Newman–Green, Blake, id.* at 924–25, 119 Ill.Dec. at 622–23, 523 N.E.2d at 89–90 said:

The Consumer Fraud Act is not intended to provide a redundant remedy to redress a private wrong.

\* \* \* \* \* \*

[T]he intent of the Consumer Fraud Act was to redress public, and not private, wrongs.

Less than a year earlier the Appellate Court for the Second District had specifically cited and adopted this Court's *Newman–Green* reading of the statute in *Century Universal Enterprises, Inc. v. Triana Development Corp.*, 158 Ill.App.3d 182, 199, 110 Ill.Dec. 229, 239, 510 N.E.2d 1260,

---

**17.** That obviates any need to address the AAMCO Mem. 8–9 contention that Bonfield has "waived" his right to rescission. Waiver concepts are really inapt here, for one element of the substantive right conferred by Section 721(2) is the 90–day notice of the election to rescind—a precondition to the exercise of the right itself.

**18.** Where the Illinois Supreme Court has not addressed an issue on which Illinois law provides the rule of decision, this Court's view of the responsibility of a federal court called upon to decide that issue is that it is required to resolve the matter in the same way that its counterpart—a trial court in the Illinois state court system—would: by following the law as announced by the Appellate Court for the district in which the trial court sits (see, e.g., this

Court's opinion in *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986) and. *Abbott Laboratories v. Granite State Ins. Co.*, 573 F.Supp. 193, 196–200 (N.D.Ill.1983), citing and discussing the controlling state court decisions on that score). In this instance the relevant court is the Appellate Court for the First District, whose view would control even if there were divergence among the different appellate districts in that respect. But this Court should emphasize that wholly apart from the choice-of-law principle referred to in this footnote, it believes the Illinois Supreme Court would reach the identical substantive result as the First and Second Districts as to the meaning and scope of the Consumer Fraud Act if the issue were to come before that highest state court.

1270 (2d Dist.1987). And in that same time frame this Court's colleague, Honorable James Moran, also agreed with the *Newman–Green* analysis, noting in *Jay Foods, Inc. v. Frito–Lay, Inc.*, 664 F.Supp. 364, 368 (N.D.Ill.1987) that "injury to consumers is an essential element" of a claim under the Act.

Yet not one of Bonfield's allegations indicates any type of pattern or systematic course of conduct that would injure consumers in general. No allegation suggests that anyone other than Bonfield was hurt by the claimed misstatements and omissions. Bonfield claims the type of isolated injury not covered by the Consumer Fraud Act. As a result his Count II Consumer Fraud Act claim is dismissed.

### 2. *Count III* [19]

#### A. *Breach of Fiduciary Duty*

■ AAMCO Mem. 15 urges dismissal of this claim because:

> Courts are virtually unanimous in holding that a franchise relationship does not impose fiduciary obligations on the franchisor.

Neither party cites, nor has this Court found, any Illinois case on that specific issue. But it is certainly safe to look, for that purpose, to general principles of fiduciary law, as expressed in such cases as *In re Estate of Wernick*, 151 Ill.App.3d 234, 244, 104 Ill.Dec. 486, 493, 502 N.E.2d 1146, 1153 (1st Dist.1986) (citations omitted):

> There is no question but that when parties engage in certain relationships such as attorney and client, principal and agent, trustee and beneficiary, or partners, a fiduciary or confidential relationship may arise as a matter of law. It is also clear that, even in the absence of

such traditional categorizations, the relationship will be found to exist as a matter of fact when one party reposes trust and confidence in another who thereby gains a resulting influence and superiority over the first.... In determining whether a fiduciary relationship has arisen, factors to be considered are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly subservient party entrusts the handling of his business and financial affairs to the other and reposes faith and confidence in him. The mere existence of a confidential relationship prohibits the dominant party from seeking any selfish benefit.

Bonfield Mem. 19–20 urges that in those terms there is at least a factual issue as to existence of a fiduciary relationship. But as this Court pointed out in *Seaboard Seed Co. v. Bemis Co.*, 632 F.Supp. 1133, 1136–37 (N.D.Ill.1986), in part by quoting *Carey Electric Contracting, Inc. v. First National Bank of Elgin*, 74 Ill.App.3d 233, 30 Ill.Dec. 104, 392 N.E.2d 759 (2d Dist.1979), Illinois courts have consistently held most business relationships do not of themselves create fiduciary obligations.[20] *Carey Electric, id.* at 238, 30 Ill.Dec. at 108, 392 N.E.2d at 763 went beyond that to say:

> Normal trust between friends or businesses, plus a slightly dominant business position, do not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship.

Thus there is no reason to believe Illinois law would impose a fiduciary obligation on a franchisor. And such a result is consistent with almost every court that has ad-

---

**19.** Because this is a diversity action, the familiar principles of *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) compel resort to Illinois choice-of-law rules. But that search need not be concluded (or even undertaken) where there is no substantive difference in legal rules as between the potential candidates for the source of law (see *In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594, 605 (7th Cir.1981)). AAMCO Mem. 6 n. 1 notes the conflict issue and then says:

> the relevant laws of both states [Illinois and Pennsylvania] are substantially similar, and application of either state's law would dictate the same result in this case.

Bonfield does not dispute that characterization. This opinion therefore follows the parties' lead in citing primarily to Illinois cases.

**20.** Accord, *Gutfreund*, 658 F.Supp. at 1395.

dressed the issue (see, e.g., *O'Neal v. Burger Chef Systems, Inc.*, 860 F.2d 1341, 1349–1350 (6th Cir.1988) (Tennessee law);[21] *Premier Wine & Spirits v. E. & J. Gallo Winery*, 846 F.2d 537, 540–41 (9th Cir.1988) (South Dakota law);[22] *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 484–85 (5th Cir.1984) (Louisiana law); *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 354–56 (7th Cir.1982) (Wisconsin law).

Bonfield's allegations do not move him out of the mainstream of franchisor-franchisee relationships, or of the type of relationship characterized in *Carey Electric*, into the more subservient position spoken of in *Wernick*. No reasonable inference calls for classifying AAMCO as a fiduciary, and that claim is dismissed.

### B. *Implied Duty of Good Faith and Fair Dealing and UCC Implied Covenant*

Bonfield Mem. 22 says:

AAMCO has breached the implied covenant of good faith and fair dealing in its Franchise Agreement with BONFIELD by unilaterally changing its procedures resulting in the inability of BONFIELD to achieve operational success. BONFIELD believes that AAMCO's conduct was in such callous disregard of AAMCO's commitment to help its licensees to achieve success that it breached its duty of good faith and fair dealing found in every contract.

Essentially Bonfield claims that when AAMCO changed its operational policies to comply with the stipulated final judgments, AAMCO breached the just-described "commitment" and "duty." Although Complaint ¶ 30 says "[s]uch duty of good faith and fair dealing was further implied by the Uniform Commercial Code," its memorandum is totally silent on that subject, and

this opinion will assume the asserted two-source claims will rise or fall together.

AAMCO Mem. 17 responds that the express terms of the Agreement allow it to modify its procedures.[23] In Agreement ¶ 5.2 Bonfield agreed "that he will comply with all of the policies and procedures which AAMCO establishes." And Agreement ¶ 5.4 said:

Franchisee [Bonfield] recognizes that it is in the mutual interests of both parties to this Agreement that the AAMCO center he operates be equipped and maintained in accordance with the highest standards of quality, and Franchisee specifically agrees to follow the directions of AAMCO in this regard, subject to the observance of any applicable laws.

Franchisee further agrees to conduct his center in accordance with AAMCO's standards.

In Illinois "a covenant of fair dealing and good faith is implied into every contract absent express disavowal" (*Foster Enterprises, Inc. v. Germania Federal Savings and Loan Association*, 97 Ill.App.3d 22, 28, 52 Ill.Dec. 303, 308, 421 N.E.2d 1375, 1380 (3d Dist.1981)). That means "where contractual discretion is exercised in bad faith, the contract is breached" (*id.* at 30, 52 Ill.Dec. at 309, 421 N.E.2d at 1381). *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 990–91, 81 Ill.Dec. 156, 170, 466 N.E.2d 958, 972 (1st Dist.1984) (citations omitted) summarizes the law in this area:

[T]he doctrine of good faith performance imposes a limitation on the exercise of discretion vested in one of the parties to a contract.... In describing the nature of that limitation the courts of this state have held that a party vested with contractual discretion must exercise that discretion reasonably and with proper motive, and may not do so arbitrarily, capriciously, or in a manner inconsistent with

---

**21.** See also the extensive list of cases with consistent holdings in *O'Neal, id.* 860 F.2d at 1349 n. 4.

**22.** Accord as to South Dakota law, *Cambee's Furniture, Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 171 (8th Cir.1987).

**23.** Although resolution of AAMCO's motion requires reference to the terms of the Agreement (a document technically outside the four corners of the Complaint), that does not convert the motion into one for summary judgment. Instead the Agreement is simply treated as incorporated into the Complaint's allegations.

the reasonable expectations of the parties.

Here a fair reading of the Agreement indicates AAMCO did have the right to change its policies applicable to franchisees. And AAMCO Mem. 17 is quite right that "contract terms implied in law cannot supplant express contract terms" (*Foster*, 97 Ill.App.3d at 31, 52 Ill.Dec. at 310, 421 N.E.2d at 1382). But that is not dispositive of Bonfield's claim.

As *Dayan* instructs us, when AAMCO decided to change its policies its implied duty of good faith compelled it to do so "reasonably and with proper motive." All the contractual discretion in this case rested with AAMCO—precisely the type of situation that the duty of fair dealing was designed to control. So even if the express terms of the Agreement permitted AAMCO to alter its policies, it could not change them arbitrarily.

When coupled with reasonably favorable inferences, the Complaint's allegations state a claim for breach of the implied duty of good faith and fair dealing.[24] AAMCO's motion to dismiss that claim is denied.

3. *Count IV*

Count IV ¶ 29 alleges:

AAMCO coerced BONFIELD into adopting the terms of the settlement agreement with the various 14 State's Attorney Generals [sic] to which BONFIELD had not been a party.

*Kaplan v. Kaplan*, 25 Ill.2d 181, 185, 182 N.E.2d 706, 708 (1962) says:

Duress has been defined as a condition where one is induced by a wrongful act or threat of another to make a contract under circumstances which deprive him of the exercise of his free will....

Economic duress, also known as "business compulsion" (*Alexander v. Standard Oil Co.*, 97 Ill.App.3d 809, 815, 53 Ill.Dec. 194, 198, 423 N.E.2d 578, 582 (5th Dist. 1981)), usually arises when one party is coerced into *entering into* a contract—that is, when rights and obligations of the parties are first established. In that situation the parties typically have fixed obligations throughout the life of their agreement. This case presents an interesting variant on that theme, for Bonfield does not claim he was coerced when he first signed the Agreement on September 4, 1986. Rather he argues that when AAMCO instituted new operational policies for its franchisees (in compliance with the stipulated final judgments in the several states), he was forced to accept those changes against his will. Bonfield asserts those changes reduced the profitability of his business.

What distinguishes this case from the garden-variety coercion claim is the Agreement's potential for a constant redefinition of some rights and obligations of the parties: AAMCO had the ongoing right to alter its franchise policies. In a sense, any such alteration might be thought of as the formation of a somewhat different contract. And there seems no reason that the doctrine of duress should be less applicable to the effectuation of a contract change than to forcing someone to enter into a new contract.[25]

AAMCO R.Mem. 18 insists it is home free because it had the right under the Agreement to make policy changes:

---

**24.** In candor, however, it is difficult to conceive a situation in which a franchisor, confronted by public authorities with complaints as to how its franchisees were mishandling their customers, would be chargeable with bad faith for agreeing to tighten up its standards of franchisee conduct to satisfy the authorities' concerns. Surely AAMCO's obligation "to help its licensees to achieve success" does not compel it to refrain from policing sharp practices, for example. But leaving aside the question whether Bonfield and his counsel have an objective good faith basis for making such an allegation in factual terms (see Rule 11), any doubts as to the provability of

such a claim provide no basis for rejecting it at the threshold Rule 12(b)(6) stage.

**25.** *Stoltze v. Stoltze*, 393 Ill. 433, 442, 66 N.E.2d 424, 428 (1946) said duress exists where one is induced "to make a contract or perform or forego an act under circumstances which will deprive him of the exercise of his free will." Arguably Bonfield's required adherence to the kind of contract change described in the text could be labeled either as "mak[ing] a contract" or "perform[ing] an act."

Illinois law ... precludes a party from maintaining a claim for duress that is predicated on a demand which is lawful or on the insistence of a legal right. *Alexander*, 97 Ill.App.3d at 815, 53 Ill.Dec. at 198, 423 N.E.2d at 582 does indeed stand for that proposition. But it begs the question to say there was no duress simply because AAMCO "only did what it had a legal right to do." This opinion has just held AAMCO had no unlimited right to institute policy changes: It could do so only "reasonably and with proper motive" (*Dayan*, 125 Ill.App.3d at 991, 81 Ill.Dec. at 170, 466 N.E.2d at 972). If AAMCO used its economic position improperly to force Bonfield to accept policy changes to his damage, it committed a "wrongful act." [26]

▮ All this, however, simply defines the theoretical potential for a duress claim. Where as here the initial granting of discretion to the alleged coercer was not itself the product of coercion, one added ingredient is essential to the kind of second-stage duress claimed by Bonfield: AAMCO's policy change for its franchisees must have been of a kind not within the parties' reasonable contemplation when the original consent to future changes was conferred by a voluntary and unforced agreement. Nothing in Bonfield's allegations indicates that (the actual changes made by AAMCO are left undescribed), and it cannot reasonably be inferred from Bonfield's mere mouthing of the conclusory words "coerced" (Count IV ¶ 29) or "economic duress and business coercion" (Count IV ¶ 30). Count IV is dismissed.

### 4. *Count V*

▮ This opinion has already found Bonfield's statutory fraud-based claims wanting as a matter of law to the extent they rest on AAMCO's purported *misrepresentations*, though perhaps viable to the extent based on its *omission* as to disclosing the situation with the state Attorneys General.[27] Because the first finding goes to the ultimate merits, the following discussion as to the *pleading* sufficiency of Count V (Bonfield's common-law fraud claim) will of course be bounded by that legal ruling.

*Soules v. General Motors Corp.*, 79 Ill. 2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980) (citations omitted) provides the definitive Illinois statement of the elements of common law fraud:

(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance.... Furthermore, the reliance by the other party must be justified, *i.e.*, he must have had a right to rely.

To the same effect, but in briefer compass, is the standard announced in *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 332, 13 Ill.Dec. 699, 705, 371 N.E.2d 634, 640 (1977):

Misrepresentation of an existing material fact coupled with scienter, deception, and injury are more than adequate.

What is most significant about those definitions for current purposes is that they do not mirror the SEC Rule 10b–5 and corresponding Franchise Act and Blue Sky Law definitions—they do not make material *omissions*, as contrasted with material *misrepresentations*, actionable. And that being the case, the only potentially viable claim—that stemming from the omission Bonfield ascribes to AAMCO—does not state a cause of action for Illinois common law fraud.[28] Count V is therefore dismissed.

---

**26.** *Alexander*, 97 Ill.App.3d at 815, 53 Ill.Dec. at 198, 423 N.E.2d at 582 (citing *Kaplan* ) says "the term 'wrongful' is not limited to acts that are criminal, tortious, or in violation of contractual duty, but *extends to acts that are wrongful in a moral sense as well.*"

**27.** "Perhaps" is the operative term here, for it will be recalled ruling was reserved on that subject earlier in this opinion.

**28.** This opinion's "Misstatement/Omission Analysis" has dealt at length with the absence of justifiable reliance on Bonfield's part on AAMCO's purported misrepresentations. *Soules* and *Steinberg* teach that such absence also dooms

### 5. *Count VI*

■ Although the Complaint labels Count VI simply as "Negligence," Bonfield Mem. 23–25 confirms that he is really pressing a claim for negligent misrepresentation. But Illinois places sharp limitations on that tort. *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 153, 104 Ill.Dec. 689, 692, 503 N.E.2d 246, 249 (1986) (quoting *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 89, 61 Ill.Dec. 746, 755, 435 N.E.2d 443, 452 (1982)), is among the numerous cases making it clear that the tort is assertable only against:

> one who is in the business of supplying information for the guidance of others in their business transactions.

And see, e.g., this Court's discussion in *National Union Fire Insurance Co. of Pittsburgh v. Continental Illinois Corp.*, 654 F.Supp. 316, 318 (N.D.Ill.1987).

Bonfield never really comes to grips with that requirement. AAMCO's business was *not* of course the supplying of information, for as Bonfield himself has said (Complaint ¶ 2):

> AAMCO is engaged in the business of franchising independently owned and franchised transmission centers under the name "AAMCO" throughout the United States.

That is fatal to Bonfield's claim, and no extended discussion is necessary. Count VI is also dismissed.[29]

### 6. *Punitive Damages*

As a final attack on the Complaint, AAMCO Mem. 21 says:

> Bonfield's common law fraud claim based on such misrepresentations.

Bonfield's demand for punitive damages should be stricken on all counts of the Complaint because he has failed to allege the facts necessary to establish their recovery under Illinois law.

At this point only two of Bonfield's claims have survived scrutiny—one tentatively (that advanced under the Franchise Act, based on AAMCO's asserted omission) and the other for sure (that based on the implied duty of good faith and fair dealing). Only those two claims therefore require further discussion at this point.

■ Neither party has addressed the question whether any claim grounded in the Franchise Act permits recovery of punitive damages. Section 721(1), which confers such private rights of action, provides:

> Any franchisee or subfranchisor may bring an action for violation of this Act to recover damages sustained by reason of such violation against the franchisor, subfranchisor, franchise broker or salesperson or other person by or on behalf of whom such sale was made or who shall have participated or aided in any way in making such sale. Such franchisee or subfranchisor, if successful, shall also be entitled to the costs of the action including, without limitation, reasonable attorney's fees.

Punitive damages (as contrasted with "damages" generally) are absent from the remedies listed there, raising at least the inference of their unavailability under the Act. After all, the General Assembly knows how to specify the recovery of punitive damages should it choose to do so.[30]

Section 723 further supports the same conclusion.[31] That section reads in relevant part:

---

**29.** There is really no excuse for a lawyer's advancing such a claim—plainly frivolous in the special sense with which the law applies that label. Illinois precedents in this area are clear and unambiguous. Even a brief review of the case law should have revealed the unavailability of the claim to Bonfield's counsel. And to compound counsel's obvious failure to have done that up front (evidenced by his failure to cite or discuss any of the Illinois cases limiting this tort), his responsive memorandum on the cur-

rent motion wholly ignored the express reference to *National Union* at AAMCO Mem. 20.

**30.** See, e.g., such statutes as Ill.Rev.Stat. ch. 30, ¶ 404(c); ch. 38, ¶¶ 14–6(c) and (e), 16–13(a); ch. 48, ¶ 1012(a) and (b); and ch. 111⅔, ¶ 5–201.

**31.** Indeed, if the matters identified and to be identified in the text were not enough, the identical negative inference is also fortified somewhat by the special remedy of attorney's fees specified by Section 721(1). That express reference, coupled with the statute's silence on the

Except as explicitly provided in this Act, no civil liability in favor of any person shall arise against any person by implication from or as a result of the violation of any provision of this Act. Nothing in this Act shall limit any liability which may exist by virtue of any other statute or under common law if this Act were not in effect.

Absent the Franchise Act, the only potential claim carrying the possibility of a punitive damages award would be one sounding in fraud. But Bonfield's charge of a material omission has already struck out as a common law fraud claim. Hence Section 723's preservation of Bonfield's common law rights provides no comfort.

In sum, nothing in the Franchise Act or the underlying common law appears to support a prayer for punitive damages. Unless and until Bonfield provides authority to support another conclusion, his claim for punitive damages under the Franchise Act is stricken.

■ Bonfield fares no better on his other remaining claim. Breach of the implied duty of good faith and fair dealing is a contract claim, as to which the general rule affords no right to punitive damages (see, e.g., *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 187, 23 Ill.Dec. 559, 566, 384 N.E.2d 353, 360 (1978)).

To be sure, *Kelsay* also announced the future recoverability of punitive damages in the class of case it dealt with—a suit for retaliatory discharge—a contract-derived claim the Supreme Court labeled as unique because it was based on "a separate and independent tort" (*id.*). But this Court is not free to reach out in this case far beyond anything the Illinois Supreme Court has held available as a remedy. That consistent teaching from our Court of Appeals has found an echo in such cases as *MHR Corp. v. Robin*, 687 F.Supp. 1257, 1258 (N.D.Ill.1988) (footnote omitted):

Under *Erie v. Tompkins* principles (this case was brought in federal court under diversity jurisdiction) this Court must perforce adhere to Illinois authority, and subject of punitive damages, also implies a lack

our Court of Appeals issues regular reminders that the assertion of novel state-law claims belongs in the state courts (which are free to change or expand Illinois law) rather than the federal courts (which are not)—see, e.g., *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir.1987) (per curiam); *Gust K. Newberg Construction Co. v. E.H. Crump & Co.*, 818 F.2d 1363, 1368 (7th Cir.1987).

That spells failure for Bonfield's other possible punitive damages prayer.

### CONCLUSION

AAMCO's Rule 9(b) motion is granted. Bonfield's potential capacity to cure the pleading deficiencies in that respect is moot.

There is no genuine issue of material fact, and AAMCO is entitled to a judgment as a matter of law, as to (1) Bonfield's Count I Franchise Act claim based on AAMCO's alleged misrepresentations and (2) Bonfield's claim for rescission under that Act. Ruling is reserved as to Bonfield's Franchise Act claim based on AAMCO's alleged omission.

Bonfield's Count II claim under the Consumer Fraud Act fails to allege consumer injury as required by Illinois case law. That claim is flawed and thus dismissed.

Likewise, Bonfield does not state a claim for breach of fiduciary duty, and that part of Count III is dismissed. Count III's claim for breach of the duty of good faith and fair dealing is viable, however, and it will stand.

Count IV's claim for economic duress is unsustainable. AAMCO's motion to dismiss that claim is granted.

Both the Count V claim for common law fraud and the Count VI negligence claim fail to state valid claims. They too are dismissed.

Finally, Bonfield has shown no arguable entitlement to punitive damages on either of his still-viable claims. AAMCO's motion to strike any prayer for such damages is granted.

of statutory authority to award the latter.

So little of the Complaint has survived that AAMCO should not be compelled to search through the rubble to see what remains to be answered. Bonfield is ordered to file an Amended Complaint on or before February 28, 1989, and AAMCO is then ordered to answer or otherwise plead to Bonfield's renewed claims on or before March 14, 1989. This action is set for a status hearing at 9:15 a.m. March 23, 1989.